**VOKAS PROVISION CO., d/b/a the Rich Plan of Western Reserve, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

Nos. 84–5886, 6007.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 18, 1985.

Decided July 21, 1986.

Timothy D. Wood (argued), Schwartz, Einhart & Simerka, Armand Cohn, Jacobs, Cohn, Wallace & Ziskind, Cleveland, Ohio, for petitioner.

Elliott Moore and Sandra Elligers, Deputy Associate General Counsels, N.L.R.B., Washington, D.C., Karen Cordry (argued), for respondent.

Before ENGEL, KEITH and KENNEDY, Circuit Judges.

ENGEL, Circuit Judge.

The issue here is what right an employer possesses, consistent with the National Labor Relations Act, to discipline employees who absent themselves from work against the express order of the employer but upon the expectation that they will be subpoenaed by the union to appear at Board proceedings.

Vokas Provision Company petitions to review and set aside a decision and order of the National Labor Relations Board issued on August 15, 1984, and reported at 271 N.L.R.B. 1010 (1985). The Board found the Company in violation of sections 8(a)(1) and 8(a)(4) of the National Labor Relations Act,

29 U.S.C. § 158(a)(1), (4),[1] when it refused to permit six employees to attend a Board representation hearing during working time, and when it subsequently discharged those employees for attending the hearing contrary to the Company's instructions. The Board has cross-applied for enforcement of its order.

## I.

The facts are essentially as found by the administrative law judge and were undisturbed by the Board which, however, reached an opposite conclusion on the issue of liability.

Vokas Provision Company is a small employer of approximately twelve full-time employees. The Company is engaged in the business of selling frozen foods and meats, freezers and microwave ovens to retail customers. This business is conducted at its Canton, Ohio, plant. The Company also maintains several sales offices scattered throughout the State of Ohio. The plant consists of four major departments: sales, meat processing, warehousing/truck driving, and office staff. Jerome Vokas is the Company's president and owner. Carl Bishop is the plant manager.

Since the mid-1970s, the Company has experienced rapid growth in its business operations. The meat processing department has played a particularly critical role in this growth. The Company has always delivered all meats frozen, which is the foundation upon which the Company has built its complete food service.

On or about March 10, 1981, District Union 427, United Food & Commercial Workers International Union began an organizing campaign at the Company's plant. Shortly thereafter, meatwrappers Gail Gelliarth and Janis Heckel, meatcutter Herb Cannon, and warehouseman/driver Walter Blakeway signed union authorization cards. On March 17, 1981, the Union filed a petition with the Regional Office seeking certification as exclusive bargaining representative of Vokas' twelve employees. In the latter part of March, 1981, the Board's attorney and the Company's attorney agreed to schedule a representation hearing for April 1, 1981,[2] although the election date was still open.

On March 30, 1981, Anthony Hackenberg, the Union's counsel, and Raymond DeSantis, a business representative for the Union, met with several meat processing employees after their shift had ended and asked them whether they would be willing to attend the April 1 representation hearing. The employees were informed that their testimony might be "useful for the Union." The employees who participated in this meeting were Gail Gelliarth, Janis Heckel, Herb Cannon and Sareth Has. During this meeting, it was decided that employees Frank Redling and Walter Blakeway should also be requested to provide testimony at the hearing. Redling and Blakeway were told the following day that the Union had requested their presence at the hearing.

On March 31, 1981, President Vokas learned, through his plant manager, that the six employees would be leaving work the following day to attend the hearing. At the end of the shift, Vokas called his employees together and read a prepared statement. He notified the employees that he could not permit all of them to attend the hearing unless they had subpoenas, but that they would be permitted to choose one of their number as a representative who

---

1. Sections 8(a)(1) and 8(a)(4) provide:
 SEC. 8(a) It shall be an unfair labor practice for an employer—
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;

 . . . . .

 (4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this Act.

2. By March 31, 1981, as a result of a stipulation reached between the parties, the only issues remaining to be resolved at the representation hearing were the eligibility of two new employees and the election date. In addition, the parties also had some differences as to whether they had agreed concerning the eligibility of part-time employees and the status of employee Frank Redling. 271 N.L.R.B. at 1022.

would be allowed to attend the hearing. Vokas explained that he could not allow production to be stopped by the absence of six employees, and that if the six employees left to attend the hearing, without subpoenas, they would be discharged for insubordination. Later that evening, two of the employees conferred with Union representative DeSantis who informed them that subpoenas would be waiting for the employees at the federal building the following morning.

On the following day, April 1, when the six employees prepared to leave for the hearing, Vokas again informed the employees that they could not leave work without subpoenas, except that a single employee could attend the hearing as their representative. Vokas also told the employees that if they left they would be discharged and not rehired. The employees responded that they had subpoenas, but when Vokas asked to see the subpoenas he was told that the Union had instructed the employees that they would be served when they came downtown to the Board. At this point, Cannon and Redling apparently informed Vokas that the six employees involved were willing to return to work after the hearing.[3] Vokas then read from the written statement and again warned the em-

ployees that they would be discharged if they left to go to the hearing without subpoenas. Cannon informed Vokas that he believed the employees would be in contempt if they did not go to the hearing. The six employees then proceeded to punch out their time cards and leave the plant. Vokas collected the cards as they were punched, and all six employees were discharged. Upon their arrival at the federal building, Union counsel Anthony Hackenberg served the six employees with subpoenas which had been issued that morning. The representation hearing was not held on that date due to the filing of the unfair labor practice charges.

On May 29, 1981, a complaint was issued against the Company charging violations of sections 8(a)(1), (3), and (4) of the NLRA. A hearing was held on the merits before an administrative law judge who issued a decision dismissing the complaint in its entirety.[4] According to the ALJ, in the absence of a subpoena or a showing that the attendance of all six employees at the hearing was necessary, the Company's legitimate interests in maintaining its business operations prevailed over the employees' interests in voluntarily attending the hearing without the Company's permission.[5]

3. The ALJ noted that, although this statement was corroborated by another employee, witnesses for the Company specifically denied that such a statement to return to work after the hearing was made. 271 N.L.R.B. at 1024 n. 11.

4. Only the 8(a)(4) and 8(a)(1) allegations were addressed by the Board and are appealed by the General Counsel. The Company was also charged with a separate violation of 8(a)(1) for unlawfully interrogating its employees. However, the Board agreed with the ALJ that the Company's conduct in this respect was not unlawful. 271 N.L.R.B. at 1010.

5. The ALJ summarized his findings and conclusions as follows:

In essence, the employees in the instant case insisted on attending a Board hearing during working hours and did so in the face of respondent's explicit prohibition against their leaving work because of needed production requirements, and further without demonstrating to Vokas any substantial reasons for attending the hearing. There are also reasons in this case, as has been noted, for

finding that the employees' attendance at the hearing was not in any realistic sense at all necessary. In the first place, the employees had not yet been actually subpoenaed and thus were under no compelling legal obligation to attend, and secondly as I have emphasized, the employees in the instant case were discharged for leaving work contrary to express orders not to do so, rather than for going to the hearing. Additionally, the employees' interests were represented at the hearing by their Union and its counsel at all times. In circumstances such as these, I fail to see how any statutory purpose would be served by holding that the employees were protected by the Act in leaving work to attend the hearing in defiance of the respondent's order that they stay on the job, and especially so in the presence of a rapidly growing business, and also strong evidence by management of actual and probably consequential economic loss of serious business disruption and production resulting from their absence.

Under the controlling circumstances here, and balancing the interest of the alleged discriminatees with the interest of respondent, I

In a 2–1 decision, a majority of the Board reversed the ALJ and found that the Company's refusal to permit the six employees to attend the representation hearing, and the Company's subsequent disciplinary action against the employees for disobeying its instructions, were in violation of sections 8(a)(4) and 8(a)(1) of the Act.[6] In reaching this conclusion, the majority emphasized that on April 1 it was evident that the employees "reasonably believed that they were legally bound to obey the subpoenas which the Union was obtaining to compel their appearances at the hearing." 271 N.L.R.B. at 1011. Therefore, according to the majority:

> In these circumstances where the employees felt as compelled to appear as if they had been served and the Respondent did not advise them concerning any infirmity based on lack of service, we would not require the employees to have subpoenas in hand in order to be within the protection of section 8(a)(4). Rather, it was sufficient that the subpoenas were awaiting the employees at the Board Offices, and that Respondent was not informed.

*Id.*[7] The Board majority therefore ordered the six discharged employees reinstated with full backpay and seniority. The majority further ordered the Company to cease discharging employees for leaving work during working hours to attend a Board hearing for the purpose of testifying.

In the instant case, it was not found, and it is not contended, that the Company's action against the six employees was motivated by any desire to interfere with the Board's processes or to otherwise discriminate against the employees because they participated in Board proceedings. Nor is there any dispute that the Company's refusal to grant permission to the six employees to attend the Board hearing was not in fact based upon legitimate business needs.[8] Rather, the only question is whether sections 8(a)(4) and 8(a)(1) prevent an employer from taking disciplinary action against a group of employees who absent themselves from work without subpoenas or permission, thereby disrupting production, whenever they "reasonably believe" that they are under a duty to attend a Board proceeding. The Board opinion cited no authority for its holding that a violation had occurred and, in fact, the Board's ruling is incompatible with its own prior rulings and with well established precedent in this and in other circuits. We therefore deny enforcement.

## II.

At the outset, we recognize that because of the Board's "special competence" in the field of labor relations, its interpretation of the Act is entitled to substantial deference. *Ford Motor Co. v. N.L.R.B.*, 441 U.S. 488, 496, 99 S.Ct. 1842, 1848, 60 L.Ed.2d 420 (1979); *N.L.R.B. v. Weingarten, Inc.*, 420 U.S. 251, 266, 95 S.Ct. 959, 968, 43 L.Ed.2d 171 (1975). Nor should we reject a ruling merely because we might prefer another view of the statute. *Pattern Makers' League of North America v. N.L.R.B.*, —— U.S. ——, 105 S.Ct. 3064, 87 L.Ed.2d 68 (1985). We also recognize that a reviewing court should be particularly hesitant to disturb the Board's conclusions where "[t]he ultimate problem is the balancing of the conflicting legitimate interests." *N.L.R.B. v. Truck Driv-*

---

am unable to conclude that the Company violated section 8(a)(4) of the Act. 271 N.L.R.B. at 1030.

**6.** The majority was composed of Members Zimmerman and Hunter. The dissent by Chairman Dotson would have upheld the dismissal of the complaint for the reasons given by the ALJ.

**7.** The Board also found that because the employees had "substantially complied" with the Company's requirement of obtaining subpoenas, it was unnecessary to inquire into the Company's business justification for discharging the six employees. 271 N.L.R.B. at 1011 n. 4.

**8.** Indeed, as noted, the ALJ found "strong evidence by management of actual and probably consequential economic loss of serious business disruption and production resulting from their absence." 271 N.L.R.B. at 1030. Since the Board declined to reach this issue the ALJ's fact-findings remain undisturbed.

*ers,* 353 U.S. 87, 96, 77 S.Ct. 643, 648, 1 L.Ed.2d 676 (1957).

In reviewing the Board's interpretation and application of the Act, therefore, our primary function is to determine whether the Board's conclusions are rational and whether they are consistent with the underlying policies of the Act as well as with prior precedent. Although the Board's determinations are subject to "limited judicial review," this does not mean that they are immunized from judicial scrutiny:

When we use the phrase "limited judicial review" we did not mean that the balance struck by the Board is immune from judicial examination and reversal in proper cases. Courts are expressly empowered to enforce, modify or set aside, in whole or in part, the Board's orders, except that the findings of the Board with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive. National Labor Relations Act as amended, §§ 10(e), (f), 29 U.S.C. §§ 160(e), (f) (1958 ed.). Courts should be "slow to overturn an administrative decision," *Labor Board v. Babcock and Wilcox Co.,* 351 U.S. 105, 112 [76 S.Ct. 679, 684, 100 L.Ed. 975 (1956) ], but they are not left "to 'sheer acceptance' of the Board's conclusions," *Republic Aviation Corp. v. Labor Board,* 324 U.S. 793, 803 [65 S.Ct. 982, 988, 89 L.Ed. 1372 (1945) ]. Reviewing courts are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute. Such review is always properly within the judicial province, and courts would abdicate their responsibility if they did not fully review such administrative decisions. Of course due deference is to be rendered to agency determinations of fact, so long as there is substantial evidence to be found in the record as a whole. But where, as here, the review is not of a question of fact, but of a judgment as to the proper balance to be struck between conflicting interests, "[t]he deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress." *American Shipbuilding Co. v. Labor Board, post* [380 U.S. 300] at 318 [85 S.Ct. 955 at 967, 13 L.Ed.2d 855 (1965) ].

*N.L.R.B. v. Brown,* 380 U.S. 278, 290–92, 85 S.Ct. 980, 987–88, 13 L.Ed.2d 839 (1965). Likewise, in *N.L.R.B. v. Pipefitters Union Local No. 120,* 719 F.2d 178 (6th Cir.1983), we observed:

Although we are not free to substitute our judgment for that of the Board simply because we would have made a different decision had we heard the case *de novo,* ... we are also not "to stand aside and rubber-stamp" Board determinations that run contrary to the language or tenor of the Act. *N.L.R.B. v. Weingarten, Inc.,* 420 U.S. at 266, 95 S.Ct. at 968.

*Id.,* at 181. And, in *N.L.R.B. v. Engineers Constructors, Inc.,* 756 F.2d 464, 467 (6th Cir.1985), we emphasized that: " '[c]areful judicial scrutiny of the Board's action is necessary ... in the face of the accusations of failure to abide by precedent since the courts have an obligation to ensure that administrative agencies adhere to enumerated policies and procedures.' " (Citation omitted). It is with these principles in mind that we review the Board's ruling here.

### III.

#### A.

Since the enactment of the National Labor Relations Act in 1935, the Supreme Court has *recognized* the employer's "undoubted right" to discharge an employee for any reason, so long as that reason is not improper under the Act. As early as 1937, the Supreme Court observed:

The Act does not compel the petitioner to employ anyone; it does not require that the petitioner retain in its employ an incompetent [employee]. The Act permits a discharge for any reason other

than union activity or agitation for collective bargaining with employees.... The petitioner is at liberty, whenever occasion may arise, to exercise its undoubted right to sever his relationship for any cause that seems to it proper save only as a punishment for, or discouragement of, such activities as the Act declares permissible.

*Associated Press v. N.L.R.B.*, 301 U.S. 103, 132, 57 S.Ct. 650, 655, 81 L.Ed. 953 (1937). The Supreme Court has also recognized that because " 'working time is for work,' " the Act " 'does not prevent an employer from making and enforcing reasonable rules covering the conduct of employees on company time,' " so long as such a rule is not adopted for a discriminatory purpose. *Republic Aviation Corp. v. N.L.R.B.*, 324 U.S. 793, 803 n. 10, 65 S.Ct. 982, 988 n. 10, 89 L.Ed. 1372 (1945) (quoting with approval from *Matter of Peyton Packing Co.*, 49 N.L.R.B. 828, 843–44); *see also Beth Israel Hospital v. N.L.R.B.*, 437 U.S. 483, 510, 98 S.Ct. 2463, 2478, 57 L.Ed.2d 370 (1978) (Powell, J., concurring in judgment).

Although the cited Supreme Court decisions did not involve the discharge of employees who absented themselves from work contrary to the employer's instructions, the Sixth Circuit has specifically upheld the right of an employer to discharge an employee under such circumstances, provided the discharge was not otherwise improper under the Act. *N.L.R.B. v. Mylan-Sparta Co.*, 166 F.2d 485 (6th Cir. 1948); *N.L.R.B. v. Superior Co.*, 199 F.2d 39 (6th Cir.1952); *Grief Brothers Corp. v. N.L.R.B.*, 635 F.2d 531 (6th Cir.1980).

In *Mylan-Sparta*, the Board found the employer in violation of sections 8(a)(1) and 8(a)(3) when it discharged a number of employees for engaging in union activities. Although the Sixth Circuit agreed that some of the discharges were discriminatorily motivated, it modified the Board's order as it affected at least one of the employees who was discharged for leaving work contrary to the employer's instructions:

It is settled that the National Labor Relations Act does not furnish a guarantee against discharge by an employer merely because the discharged employee is a member of a union. The Act does not take from the employer the right to make and enforce reasonable rules for the conduct of the business and to take disciplinary action against employees who either violate the rules, are inefficient or malcontent, or for reasons are generally not suitable for efficient production. The Act does not authorize the Board to substitute its own ideas of discipline or management for those of the employer, except barring discrimination or discharge for union membership.

166 F.2d at 490–91. (Citations omitted).

Our court reached a similar result in *N.L.R.B. v. Superior Co.*, 199 F.2d 39 (6th Cir.1952). The Board in *Superior* found the company in violation of sections 8(a)(1) and (3) of the Act when it refused the requests of five employees for a day off to attend an informal conference with the Board's representative and when it subsequently imposed a penalty upon the members of the committee for taking the day off contrary to the company's instructions. The Board also found that the company violated section 8(a)(1) by threatening to lay off an employee should he attend a scheduled Board representation hearing. This court, however, refused to enforce the Board's order, finding that the company's conduct was not in violation of the Act. Initially, we observed:

It is conceded by the Board that the Act does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them for any reason except union activity or relationship. If a discharge is not arbitrarily made with a purpose, or as an excuse, to avoid the statute, it is not unlawful. (Citations omitted). The employer's right to hire and fire includes the right to make reasonable rules and regulations and to discipline employees for violation thereof.

*Id.* at 42 (citing *N.L.R.B. v. Mylan-Sparta Co.,* 166 F.2d 485, 491 (6th Cir.1948)). We further noted:

> If the refusal of the [company] to grant the requested leave of absence was valid, disciplinary action which followed for a violation of the order was not improper. However, if the refusal to grant the requested leave of absence was invalid under the Act, the disciplinary action which followed was likewise invalid.

*Id.* (citing *Republic Aviation Corp. v. N.L. R.B.,* 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945)). Applying these principles, we concluded that the company did not violate sections 8(a)(1) and (3) when it refused to permit the five employees to attend the informal conference and when it subsequently laid off the employees for leaving work without permission for the purpose of attending an informal Board conference.[9]

Quite clearly, our holding in *Superior* supports the proposition that an employer may take disciplinary action against an employee who absents himself from work without permission and contrary to the employer's instructions, even though the employee desires to attend Board proceedings. In reaching this conclusion, our court engaged in a balancing of the respective interests, similar to that undertaken by the ALJ here. Thus, with respect to the company's refusal to permit the employees to attend the informal conference, we noted that the company was "fully justified in refusing to grant the request." *Id.* at 43. In this respect, we observed that the Board proceeding was an informal conference at which attendance was not required. We also emphasized that there was no evidence that the employees' attendance was "either necessary or advisable, or that any information was obtained which the Board representative did not already have, or could not have acquired by either correspondence or by a telephone conversation." *Id.*

 In all candor there are certain points of differences between *Superior* and the case here. Unlike the charges here, which involve alleged violations of sections 8(a)(1) and (4) of the Act, *Superior* was analyzed in the context of alleged violations of sections 8(a)(1) and (3) of the Act. Moreover, although the same conduct may give rise to a violation of sections 8(a)(1), 8(a)(3), and 8(a)(4), the standards for determining a violation under these sections are not identical.[10]

---

9. With respect to the second incident in *Superior,* i.e., the threatened layoff of an employee should he attend a formal hearing held by the Board, our court also found that the company's conduct in this respect was not in violation of section 8(a)(1). In so finding, we stated:

> We agree with the Board's contention that it would be a violation of the Act for the respondent to refuse to permit an employee to attend a formal hearing of the Board where his presence was requested by the Board. *N.L.R.B. v. Fulton Bag & Cotton Mills,* 180 F.2d 68, 70 (10th Cir.1950). But, in our opinion, the incident between Paul Baker and General Manager Nicholas in the plant cafeteria was not of that nature. The trial examiner treated the incident as a trivial one referring to it in a footnote and not making it the basis of any violation of the Act. Nicholas' statement was made as part of some general "banter" at the time between him and Baker. Baker had not asked permission to attend the hearing. The Board had not requested his presence at the hearing. Nicholas' statement was to the effect that if Baker *did the same thing he did before,* he would again receive disciplinary action. What he did before was to absent himself contrary to orders, for the purpose of making a useless and unnecessary trip. Strictly analyzed, this was not a statement of the respondent's policy with respect to formal meetings of the Board where his presence would be required. Since no such situation has presented itself, it is entirely conjectural to predict what the respondent would do under such circumstances. In any event such casual and isolated remarks of a supervisory employee are not chargeable to the employer in the absence of supporting evidence that they reflect the views of management.

*Id.* at 44. (Citations omitted).

10. Whereas section 8(a)(4) makes it an unfair labor practice for an employer "to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this Act," section 8(a)(3) makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." A finding of anti-union animus is ordinarily an essential element of a section 8(a)(3) violation. As the Supreme Court stated:

It is also true that, in contrast to *Superior,* which involved an informal Board conference, the employees here attended a formal Board representation hearing. However, here, as in *Superior,* the ALJ found that the employees' attendance at the Board representation hearing was not "in any realistic sense at all necessary." Moreover, the employees attended the Board representation hearing not at the request of the Board but at the Union's request. Finally, in *Superior,* we observed that when the employer's legitimate business interest in maintaining discipline was balanced against the employees' relatively insignificant interests in attending the informal conference, the employer's disciplinary action was justified even though the absence of the employees did not create a production problem. Here, of course, the ALJ found "strong evidence" of economic loss and "serious business disruption." Thus, although *Superior* involved attendance at an informal rather than a formal Board proceeding, the factors which justified the employer's action in *Superior* are even more applicable here.[11]

Under that section both discrimination and a resulting discouragement of union membership are necessary, but the added element of unlawful intent is also required.... The discriminatory act is not by itself unlawful unless intended to prejudice the employees' position because of their membership in the union; some element of anti-union animus is necessary.

*N.L.R.B. v. Brown,* 380 U.S. 278, 286, 85 S.Ct. 980, 985, 13 L.Ed.2d 839 (1965). *See also N.L.R.B. v. Transportation Management Corp.,* 462 U.S. 393, 398, 103 S.Ct. 2469, 2472, 76 L.Ed.2d 667 (1983); *N.L.R.B. v. Great Dane Trailers,* 388 U.S. 26, 33–34, 87 S.Ct. 1792, 1797, 18 L.Ed.2d 1027 (1967); *American Shipbuilding Co. v. N.L.R.B.,* 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965). It is only when the employer's discriminatory conduct is " 'inherently destructive' of important employee rights, [that] no proof of anti-union motivation is needed...." *Great Dane Trailers,* 388 U.S. at 34, 87 S.Ct. at 1798.

Unlike section 8(a)(3), the Board has held that a section 8(a)(4) violation does not require a finding of anti-union animus. *See, e.g., Block-Southland Sportswear, Inc.,* 170 N.L.R.B. 936, 981 (1968), *enforced,* 420 F.2d 1296 (D.C.Cir. 1969). *See also Service Employees International Union, Local 250 v. N.L.R.B.,* 600 F.2d 930, 939 (D.C.Cir.1979). The reason anti-union animus is not an element of a section 8(a)(4) violation is that section 8(a)(4) protects employees against retaliatory action for filing unfair labor practices or giving testimony under the Act even though they are not union members or otherwise engaged in union activities. Although not always explicitly stated, a section 8(a)(4) violation ordinarily requires a finding of adverse action plus discriminatory intent; that is, it must be found that the employer has retaliated against an employee *because* he filed unfair labor practices or otherwise participated in the Board's processes. *See, e.g., N.L.R.B. v. Scrivener,* 405 U.S. 117, 92 S.Ct. 798, 31 L.Ed.2d 79 (1972); *Pacemaker Corporation v. N.L.R.B.,* 260 F.2d 880 (7th Cir.1958); *N.L.R.B. v. Fulton Bag & Cotton Mills,* 180 F.2d 68 (10th Cir.1950); *see also N.L.R.B. v. Retail Store Employees Union,* *Local 876,* 570 F.2d 586 (6th Cir.1978). Although some cases have found an 8(a)(4) violation even in the absence of an employer's discriminatory intent, such cases appear to be relatively rare and invariably involve an employee who has already been subpoenaed [sic] and who is thus under a present legal obligation to attend a Board proceeding. *See, e.g., Western Clinical Laboratory, Inc.,* 225 N.L.R.B. 725 (1976), *enforced in part and denied in part,* 571 F.2d 457 (9th Cir.1978).

In contrast to a section 8(a)(3) or section 8(a)(4) violation, a section 8(a)(1) violation does not require a finding of any kind of discrimination. Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7." Section 7 provides:

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection....

Although section 7 does not provide an employee with the express right to file unfair labor practices or to give testimony under the Act, it is clear that this right is implicit under section 7 as well as under section 8(a)(4). *See E.H. Limited, d/b/a Earringhouse Imports,* 227 N.L.R.B. 1107, 1108 (1977), *enforcement denied,* 600 F.2d 930 (D.C.Cir.1979); *Better Monkey Grip Company,* 115 N.L.R.B. 1170, *enforced,* 243 F.2d 836 (5th Cir.1957), *cert. denied,* 355 U.S. 864, 78 S.Ct. 96, 2 L.Ed.2d 69 (1957).

**11.** The most recent case in the Sixth Circuit to uphold the right of an employer to take disciplinary action against an employee for absenting himself from work is *Grief Brothers Corp. v. N.L.R.B.,* 635 F.2d 531 (6th Cir.1980). In *Grief Brothers,* the Board found that the employer applied its previously established leave policy in a discriminatory manner when it refused to grant employees from twenty-one plants leave

### B.

While acknowledging our decision in *Superior*, the General Counsel nevertheless argues that section 8(a)(4) should be liberally applied to protect the employees from being discharged here, especially since subpoenas were supposedly awaiting them at the federal building. Of course, we recognize that an employer may not discharge an employee because he has testified under the Act. Such an action would be a literal violation of section 8(a)(4).

> Sec. 8. (a) It shall be an unfair labor practice for an employer—
>
> (4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this Act.

We also recognize that section 8(a)(4) is to be broadly construed. *N.L.R.B. v. Scrivener*, 405 U.S. 117, 121, 92 S.Ct. 798, 801, 31 L.Ed.2d 79 (1972). In *Scrivener*, the Supreme Court held that section 8(a)(4) prohibits an employer from discharging an employee for giving written sworn statements to a Board field examiner. Although the employee had not literally "filed charges or given testimony," the Court emphasized that broad protection is necessary " 'to prevent the Board's channels of information from being dried up by employer intimidation of prospective complainants and witnesses.' " *Id.* at 122, 92 S.Ct. at 801 (quoting *John Hancock Mut. Life Ins. Co. v. N.L.R.B.*, 191 F.2d 483, 485 (D.C.Cir. 1951)).

*Scrivener* was followed by our circuit in *N.L.R.B. v. Retail Store Employees Union, Local 876*, 570 F.2d 586 (6th Cir.1978). There, we held that section 8(a)(4) protects an employee from retaliatory discharge for *refusing* to testify voluntarily for the union

in an earlier unfair labor practice proceeding. Noting that the Supreme Court had interpreted section 8(a)(4) to afford "broad rather than narrow protection" in order "to prevent the Board's channels of information from being dried up by employer intimidation of prospective complainants and witnesses," we concluded that:

> Similar considerations militate in favor of extending statutory protection to the activity involved in this case. Although [the employee] was not prevented from reporting information to the Board, the coercion applied against her had a direct bearing on a pending Board proceeding.... Coercing employees to give untrue testimony just as surely undermines the integrity of Board proceedings as does coercing employees to give no testimony at all.

*Id.* at 590. Thus, like the Supreme Court in *Scrivener*, our court focused on section 8(a)(4)'s broad protection in terms of how an employer's improperly motivated action against an employee might interfere with the integrity of Board proceedings. *See also N.L.R.B. v. Overseas Motor, Inc.*, 721 F.2d 570 (6th Cir.1983); *Pacemaker Corp. v. N.L.R.B.*, 260 F.2d 880, 883 (7th Cir. 1958). That factor, present in the Supreme Court's ruling in *Scrivener* and in our circuit's ruling in *Retail Stores*, is altogether missing here and the Board does not claim otherwise.

We note that there are cases which hold that once a subpoena is served upon an employee the employer's motivation is irrelevant and the employer's obligation is one of noninterference with the employee's duty to respond to the subpoena. *See E.H. Limited, d/b/a Earringhouse Imports*, 227 N.L.R.B. 1107, 1110 n. 10 (1977), *en-*

---

from work to attend a conference at the union's international headquarters. The conference was designed to explore the feasibility of developing a coordinated bargaining program among the various units of the employer company. The employer's refusal to grant leaves from work to attend the conference was found to violate section 8(a)(1) of the Act, and the discharge of an employee who absented himself from scheduled work to attend the conference after being denied leave was found to violate

section 8(a)(3). In refusing to enforce the Board's order, we concluded that "this case is controlled by our decision in *N.L.R.B. v. Superior Co.*, 199 F.2d 39 (6th Cir.1952)," 635 F.2d at 532, emphasizing that "since the employee who was discharged for absenting himself from work to attend the meeting did so in the face of a denial of his request for leave and a warning that his absence from work would result in disciplinary measures, we conclude that the discharge did not violate the Act." *Id.*

*forcement denied, Service Employees International Union, Local 250 v. N.L.R.B.,* 600 F.2d 930 (D.C.Cir.1979); *Walt Disney World,* 216 N.L.R.B. 836 (1975); *Neptune Meter Co.,* 212 N.L.R.B. 87 (1974); *Newland Knitting Mills,* 165 N.L.R.B. 788 (1967); *East Tennessee Undergarment Company,* 139 N.L.R.B. 1129 (1962), *enforced,* 53 L.R.R.M. 2461 (6th Cir.1963); *Winn-Dixie Greenville, Inc.,* 128 N.L.R.B. 574 (1960). *But see Item Co.,* 113 N.L.R.B. 67 (1955).[12] In each of these cases, however, it was emphasized that a subpoena had actually been served upon the employee. Here, the employees had not been served with subpoenas at the time they left work against Vokas' instructions.

### C.

The General Counsel insists, and the Board majority held, that for purposes of 8(a)(4) the employees' reasonable belief that they are under a duty to respond to issued but unserved subpoenas is equivalent to actual service of a subpoena. As the Board majority stated: "We do not deem it appropriate to countenance these discharges based solely on the technical lack of service of the subpoenas." 271 N.L.R.B. at 1011 n. 4. This position, however, is simply inconsistent with the Board's own procedures and regulations as well as its own prior rulings.

Both the NLRA and the Board's Rules and Regulations set out detailed procedures to govern the issuance, service and revocation of subpoenas. Section 11(1) of the Act empowers the Board to issue subpoenas compelling the attendance of witnesses upon the application of any party to the proceedings. 29 U.S.C. § 161(1); *see also* 29 C.F.R. § 102.31(a) (1985). Once a subpoena is issued, the Board's Rules and Regulations provide for only four methods of service: "[S]ubpoenas of the Board ... may be served personally or by registered or certified mail or by telegraph or by leaving a copy thereof at the principal office or place of business of the person required to be served." 29 C.F.R. § 102.-111(a) (1985); *see also* 29 U.S.C. § 161(4). Additionally, it is only after a person has been served that he can seek a revocation of the subpoena, and then he must do so "within 5 days after the date of service of the subpoena upon him...." 29 C.F.R. § 102.31(b). Further, a person is under a duty to obey a subpoena only when that person has been validly served. As the Supreme Court observed in *United States v. Bryan,* 339 U.S. 323, 330, 70 S.Ct. 724, 730, 94 L.Ed. 884 (1950), "when the government introduced evidence that respondent had been *validly served* with a lawful subpoena directing her to produce records within her custody and control, and that on the day set out in the subpoena she intentionally failed to comply, it made out a *prima facie* case of willful default." (Emphasis added). In *N.L.R.B. v. C.E. Strickland,* 321 F.2d 811, 814 (6th Cir.1963), our court reiterated this principle in the context of N.L.R.B. proceedings when we stated: "In *United States v. Bryan* ... the opinion recognizes that the obligation of a witness to testify in response to a subpoena is conditional upon being 'properly summoned.'"

The Board, too, has recognized that "the obligation to honor the subpoena arises immediately when the subpoena is *duly issued and served.* It is only when the person served fails to fulfill this obligation that the necessity arises to seek enforcement of the obligation in the District

---

12. In *Item Co.,* the Board adopted the ALJ's findings and conclusions and held that the employer did not violate section 8(a)(4) even though it refused to permit two employees, who had been subpoenaed, to attend a Board hearing at the same time, and even though the employer subsequently discharged one of the employees for leaving the plant without first obtaining permission. In reaching his conclusion, the ALJ found it significant that there was no evidence of anti-union animus on the part of the employer. More importantly, however, the ALJ noted that the employer had made efforts to "release employees for the hearing one at a time to avoid undue disruption of operations." 113 N.L.R.B. at 86. The ALJ also emphasized that "the employer cooperated in arranging to have all necessary employees available to testify at the hearing." *Id.*

Court." *Winn Dixie,* 128 N.L.R.B. 574, 579 (1960) (emphasis added); *see also Babcock and Wilcox,* 114 N.L.R.B. 1465, 1469 (1955). Further, in *Nestle Company,* 248 N.L.R.B. 732, 740 (1980), *enforced,* 659 F.2d 252 (D.C.Cir.1981), the Board adopted the ALJ's findings as follows:

> While employees have a statutorily protected right to file and support unfair labor practice charges and objections, they do not have a statutorily protected right to leave work without permission, thereby disrupting production, *at least in the absence of having been served with a subpoena.*

(Emphasis added).

The Board's ruling here is also inconsistent with its Rules and Regulations relating to the payment of witness fees. Section 11(4) of the Act provides that "Witnesses summoned ... shall be paid the same fees and mileage that are paid witnesses in the courts of the United States...." 29 U.S.C. § 161(4); *see also* 29 C.F.R. § 102.32 (1985).[13] The Board's regulations provide that "Witness fees and mileage shall be paid by the party at whose instance the witnesses appear...." 29 C.F.R. § 102.32. In addition, Rule 45(c) of the Federal Rules of Civil Procedure provides that the tendering of such fees shall accompany the service of the subpoena. In this regard, the Board has held: "The Administrative Law Judge found, and we agree, that the subpoenas were defective because they were not accompanied by witness and mileage fees as required by Section 102.32 of the National Labor Relations Board Rules and Regulations, Series 8, as amended." *Rolligon Corp.,* 254 N.L.R.B. 22 (1981). *See also O.K. Machine & Tool Corp.,* 279 N.L.R.B. No. 69 (1986).[14]

Finally, we note that the Board's ruling is inconsistent with the underlying purposes of the Board's subpoena power. The purpose of the subpoena power granted under the Act is two-fold. While protecting the integrity of Board proceedings on the one hand, it also protects the potential witness from at least some abuse. At the best, the employees affected here were bound to lose time from work and their paychecks would be correspondingly affected. A rule which requires that, if the Union wishes the employee to attend, the Union observe the formality of a subpoena, including the payment of witness fees (unless waived by the witness), assures that the process of the Board is thus respected and the subpoena power itself is less likely to be abused. It surely was not unreasonable here for the Union, if it genuinely needed the attendance of these people, to have served subpoenas upon the employees, along with witness and mileage fees, and it is acknowledged that it had nearly a full two weeks' notice of the hearing in which to do so. Had the subpoenas actually been served at the time the employees sought to be excused, the employer could have contacted the Board and presumably have made arrangements to schedule the appearance in an orderly fashion and thus minimize disruption to its business. It is not difficult, however, to foresee that the Board would be wary of making such arrangements where in fact no such subpoenas at the time had been issued or served, for to do so would have placed itself between the two litigants without any appropriate basis for action. Likewise the Company, in our view, was not obligated to accept at face value the assertions of the Union and to honor them when indeed the entire purpose of the proceedings was to determine whether the Union should in fact be the representative of the employees involved.

We are fully satisfied, therefore, that a person's reasonable belief that he or she is under a duty to obey an issued but un-

---

13. 28 U.S.C. § 1821(b) provides:

> A witness shall be paid an attendance fee of $30 per day for each day's attendance. A witness shall also be paid the attendance fee for the time necessarily occupied in going to and returning from the place of attendance at the beginning and end of such attendance or at any time during such attendance.

14. Although such fees may be waived, the Board has stated that the mere fact that employees support the union does not constitute such a waiver. *Rolligon Corp.,* 254 N.L.R.B. at 22 n. 4.

served subpoena simply cannot be treated as the equivalent of actual service; nor do we believe that the lack of such service is a mere "technicality." Plainly, if a party were able to avoid complying with the Board's subpoena formalities, which is the effect of the Board's conclusion here, the Board's subpoena power could become subject to much abuse to the detriment of the employee. We conclude, therefore, that the Board's rule here is not only inconsistent with the policies and procedures relating to the Board's subpoena power, but it is also in conflict with the Board's own precedent which recognizes that a subpoena becomes effective only upon compliance with the formalities of the Board's statutory and regulatory requirements. Indeed, as other courts have observed in a similar context: " 'Congress has made elaborate provisions for obtaining and enforcing [N.L.R.B.] subpoenas,' and '[i]t was obviously its intention that this machinery be utilized.' " *N.L.R.B. v. International Medication Systems, Ltd.*, 640 F.2d 1110, 1116 (9th Cir. 1981) (quoting *N.L.R.B. v. C.H. Sprague & Son Co.*, 428 F.2d 938, 942 (1st Cir.1970)); *see also Hydro Conduit Corp.*, 274 N.L.R.B. No. 190 (1985). *Cf. N.L.R.B. v. Duval Jewelry Co.*, 357 U.S. 1, 78 S.Ct. 1024, 2 L.Ed.2d 1097 (1958); *Lewis v. N.L.R.B.*, 357 U.S. 10, 78 S.Ct. 1029, 2 L.Ed.2d 1103 (1958).

### D.

In the absence of a subpoena, it is well established, both under appellate authority and Board precedent, that an employee does not have a statutorily protected right to absent himself from work without permission even though he seeks to voluntarily testify at a Board proceeding; rather, a balance must be struck between the interests of the employee in attending the proceeding and the interests of the employer in maintaining production and discipline over his work force.[15] *See Service Employees International Union, Local 250 v. N.L.R.B.*, 600 F.2d 930 (D.C.Cir.1979); *N.L.*

*R.B. v. Superior Co.*, 199 F.2d 39 (6th Cir.1952); *E.H. Limited, d/b/a Earringhouse Imports*, 227 N.L.R.B. 1107 (1977); *Montgomery Ward & Co., Inc.*, 220 N.L.R.B. 373 (1975), *enforced*, 554 F.2d 996 (10th Cir.1977); *Standard Packaging Corporation, Royal Lace Paper Division*, 140 N.L.R.B. 628 (1963); *see also Supreme Optical Company, Inc.*, 235 N.L.R.B. 1432 (1978), *enforced*, 628 F.2d 1262 (6th Cir. 1980), *cert. denied*, 451 U.S. 937, 101 S.Ct. 2016, 68 L.Ed.2d 324 (1981); *Johns-Manville Products Corporation*, 100 N.L.R.B. 508 (1952). Here, the Board, unlike the administrative law judge, altogether failed to engage in a balancing of the respective interests finding instead that the employees' reasonable belief was equivalent to actual service. As already explained, this, in our view, was error and is plainly inconsistent with prior authority both of the Board and of the Sixth Circuit.

Indeed, in *Standard Packaging Corp.*, 140 N.L.R.B. 628 (1963), the Board found that the employer did not violate sections 8(a)(1), (3), and (4), when it refused to grant two employees advance permission to absent themselves from work for the purpose of attending a Board representation proceeding and when it thereafter discharged these employees when, in disregard of the employer's directions, they absented themselves from work to attend the hearing. In balancing the respective interests, the Board noted that on the one hand, the employees were unable to demonstrate "any real need for their appearance at the hearing" while, on the other hand, the employer's asserted reliance upon its work schedule for its unwillingness to release more than two employees to attend the hearing was supported in the record. In addition, the Board noted that the subsequent disciplinary action "was motivated solely by the [employees'] absence from the plant in disregard of orders." Therefore,

---

**15.** Of course, this balancing of interests is not required if the employer's action against the employee is discriminatorily motivated. *See supra* n. 10.

on balance, the employer's action was not in violation of the Act.[16]

*E.H. Limited, d/b/a Earringhouse Imports,* 227 N.L.R.B. 1107 (1977), in our view, is the closest Board decision supporting its position here. After the union began organizing the employer's plant, a representation hearing was scheduled for August 8. When eleven of the employer's employees requested to attend the hearing, Pellerito, a corporate officer, told them that she had learned from counsel that it was not necessary that all the employees attend the hearing and in consequence stop production. On the day before the hearing, the employees again requested permission to attend the hearing. Pellerito, however, informed them that the company would not allow them to attend the hearing but that they could select one of their number to attend as their representative. Sometime later in that day, one of the employees contacted the union agent and informed him about the employer's position. The union agent told the employee that it was probably too late to subpoena the employees, that their testimony might prove necessary and that, in any event, the Act protected their right to attend the hearing. On the day of the hearing, the employees notified the employer that they were going to attend the hearing and thirteen of them signed out. Although all of the employees attended the hearing, they were told that they need not testify in light of the morning's testimony. When the employees returned to work later that afternoon, they were informed that they were being discharged for insubordination.

In addressing the issue of whether the employer's conduct was in violation of sections 8(a)(4) and (1) of the Act, a majority of the Board applied the following test:

In our view, under a proper construction of section 8(a)(4) an employee may not lawfully be discharged after participation in any Board proceeding during his regular working hours (a) where an employer can establish no business necessity justifying a requirement that the employee stay on the job or (b) where a business justification is established but which in the particular circumstances is not on balance sufficient to overcome the employee's assertion of his right to attend or participate.

*E.H. Limited,* 227 N.L.R.B. at 1108–09. Applying this test to the facts of *Earringhouse Imports,* the Board majority held that, although "there were no terribly important reasons or exigencies crying out for employee attendance at the hearing," the employer failed to demonstrate that its refusal to permit the employees to attend the Board hearing was justified by sufficiently valid business reasons. According to the majority, therefore, the burden of justification should be on the employer under these circumstances.[17]

**16.** *Standard Packaging* was subsequently distinguished on the ground that the employer there was not motivated by any desire to interfere with the N.L.R.B.'s processes or with the employees' right to attend the proceeding as prospective witnesses, but was merely attempting to provide itself with a sufficient workforce without preventing anyone from attending the hearing. *See Billen Shoe Co.,* 166 N.L.R.B. 57 (1967), *enforcement denied in part and granted in part,* 397 F.2d 801 (1st Cir.1968).

**17.** In support of its view that the burden of justification should be placed on the employer, the Board majority cited to the Supreme Court's decision in *N.L.R.B. v. Great Dane Trailers, Inc.,* 388 U.S. 26, 33–34, 87 S.Ct. 1792, 1797, 18 L.Ed.2d 1027 (1967). According to the Board:

The Supreme Court has stated in effect, though in a context different from that here before us, that where an employer's conduct interferes with the employees' rights—and no explicit discriminatory motive is shown—the burden is nevertheless on the employer to come forward with evidence of "legitimate and substantial business justification" for its conduct if it is not to be found to have violated the Act. And so it is here that the burden should not be, as the dissent would have it, on the employees to come forward with evidence of "compelling circumstances" to justify their exercise of their right to attend a Board hearing but rather the burden should be on the employer to justify interfering with the exercise of that right.

227 N.L.R.B. at 1110. The two dissenting Members strongly disagreed with the majority's analysis and conclusion. In their view, the burden should be on the employees to "demonstrate substantial reasons for attending the Board hearing." *Id.* at 1112–13.

The majority's analysis and conclusion in *Earringhouse Imports* were expressly rejected on appeal by the D.C. Circuit in *Service Employees International Union, Local 250 v. N.L.R.B.*, 600 F.2d 930 (D.C. Cir.1975), which refused to enforce the Board's order. A majority of the D.C. Circuit held that, in the absence of a subpoena or call from the Board to attend a hearing, the burden was on the employee to " 'demonstrate substantial reasons for attending a Board hearing, [and] unless there are compelling reasons urging their attendance, the employer's right to maintain normal operations should, and does, take precedence over the employee's right to leave work during regular working hours for such attendance or for any other purpose except that of legitimate strike activity'...." *Id.* at 938. The majority of the D.C. Circuit was particularly concerned with the disruptive effect that the Board's approach would have on the employer's business operations:

> To uphold the Board majority in this case would result in complete disruption of the employer's productive ability. Presumably, business enterprises are operated in the expectation of some profit. The Board majority has invited employees—indeed all employees—to attend Board representation hearings during normal working hours and in violation of an express prohibition against leaving work at that time without the benefit of a subpoena or other showing that the employee's presence is required, unless the employer, upon whom the burden of proof is placed, can show substantial and legitimate business justification for requiring the employees to remain on the job. We cannot sanction such a pronouncement even though we acknowledge the Board's expertise in the field. In effect, as in this case, even where the employer's entire production line is shut down by reason of a mass exodus of

employees, the Board majority suggests that this is not a substantial and legitimate business justification.[18] *Id.* at 938.

In the instant case, the ALJ concluded that even under the *Earringhouse* approach, Vokas' refusal to permit the six employees to attend the representation hearing and the subsequent discharge of these employees were not in violation of section 8(a)(4) or section 8(a)(1) of the Act. The ALJ found that, whereas in *Earringhouse* there was no evidence that the employer informed the employees about the economic consequences that would result from their absence, the employees here "were well aware of the plant expansion and new facilities, the increase in sales, the increased number of employees, and of [the company's] numerous production problems which had been the subject of talks and meetings by Vokas in January, February and on March 30, 1981." 271 N.L.R.B. at 1028. The ALJ also noted that unlike *Earringhouse*, where the Board relied upon an offer by employees to make up lost time, the testimony on this issue in the instant case was vague and inconsistent and, in any event, could not have been made in good faith because "there was no time left in which to hardly make anything up." *Id.* Finally, the ALJ noted that in *Earringhouse*, the Board found it significant that the employees were not discharged until after they returned from the Board hearing and two hours before their quitting time, and that such sequence did not show any concern about an adverse affect upon production. In the instant case, however, the ALJ found it "clear that Vokas was concerned not only in operating his business without disruption due to demands of increased sales, but also with his legitimate right to control absenteeism and to maintain discipline." *Id.* at 1029. Based on these and additional findings which were supported in the record, the ALJ concluded

---

**18.** The majority of the D.C. Circuit also criticized the Board majority for relying on *Great Dane Trailers* to place the burden of justification on the employer. According to the majority of the court, *Great Dane Trailers* was intended to be limited to section 8(a)(3) violations, and the majority did not think it prudent to extend that rule to an alleged section 8(a)(4) violation.

that the Company's conduct was not in violation of sections 8(a)(4) or 8(a)(1). It is also apparent that if, as the ALJ concluded, the Company's conduct is not unlawful under the Board majority's analysis in *Earringhouse Imports*, the Company's conduct is *a fortiori* not unlawful under the D.C. Circuit's analysis in *Service Employees International Union*. Since we conclude that the ALJ's factual findings and conclusions are supported by substantial evidence, and were left undisturbed by the Board, it is not necessary to the decision here that we make a specific choice between the two views.

### IV.

In conclusion, the Company did not violate sections 8(a)(1) and 8(a)(4) of the Act when it refused to permit six employees to voluntarily attend a Board representation hearing during working time without a subpoena, and when it subsequently discharged those employees for leaving work contrary to the Company's explicit instructions. In reaching this conclusion, we emphasize that there is no evidence that the Company was in any way motivated by any desire to intimidate, coerce, or otherwise retaliate against the employees because they participated in a Board proceeding. Nor is there any evidence that the Company desired to interfere with the Board's processes. Rather, it appears from the undisputed evidence that the Company was concerned solely with avoiding a disruption of its business operations and with maintaining discipline over its workforce. We also note that at the time the Company refused the employees' request, and at the time the employees were discharged for disobeying the Company's instructions, the employees had not actually been served with a subpoena and were therefore under no compelling legal obligation to attend the hearing. Although the employees may have reasonably believed they were under a legal obligation to attend the hearing, we do not believe that this is an adequate substitute for actual service in the circumstances of this case. It is also evident, as found by the ALJ, that the attendance of all six employees at the representation hearing was simply not necessary. Indeed, of the six employees who attended the representation hearing, four worked in the meat processing department and two worked in the warehousing/truck driving department; however, as of March 31, 1981, as a result of a stipulation reached between the parties, there was no real issue about including meat cutters, wrappers, drivers and warehousemen in the proposed bargaining unit. Moreover, the Company was willing to permit the employees to choose one of their number to attend as a representative of the employees. Finally, it is significant that although the Union had ample opportunity to serve the employees with subpoenas, it waited until the morning of the representation hearing to do so and only after the employees had arrived at the representation hearing. Neither the Union nor the employees themselves made the slightest effort to accommodate the Company's legitimate interest in maintaining its business operations. Under these circumstances, the Board's order is not supported by substantial evidence; nor is the Board's interpretation of the Act consistent with the underlying policies of the Act, with the Board's own pronouncements, or with prior precedent in this and in other circuits. Enforcement is therefore DENIED.