The RUST ENGINEERING COMPANY
et al., Petitioners,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 20838.

United States Court of Appeals,
Sixth Circuit.

July 15, 1971.

Charles Kelso, Atlanta, Ga., for petitioners; Stewart T. Graham, Fisher & Phillips, Atlanta; Ga., on brief for Rust Engineering Co., John O. Gibson, Fowler & Gibson, Loudon, Tenn., on brief for Sheet Metal Workers.

Howard C. Hay, N.L.R.B., Washington, D. C., for respondent; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Nancy M. Sherman, Stanley J. Brown, Attys., N.L.R.B., Washington, D. C., on brief.

Before CELEBREZZE, PECK and McCREE, Circuit Judges.

McCREE, Circuit Judge.

The Rust Engineering Company and Local 51 of the Sheet Metal Workers International Union petition for review of an order of the National Labor Relations Board finding them in violation respectively of §§ 8(a) (3) and 8(a) (1) and §§ 8(b) (2) and 8(a) (1) of the National Labor Relations Act, 29 U.S.C. §§ 158(a) (3), (b) (1), (b) (2), (a) (1). The violations arose out of layoffs of two union members, Henry Wyrick and Talmadge Miller, from a construction job in Oak Ridge, Tennessee.

The Board found that Local 51 violated §§ 8(b) (2) and (a) (1) by causing Rust to discriminatorily lay off Wyrick and Miller because of their opposition to the reelection of the Local's Business Agent, John Fuller. The Board also found that the company violated §§ 8(a) (3) and (a) (1) by acceding to the union's desires and discriminatorily laying off the two employees. The Board ordered both parties to cease and desist from such practices and to post appropriate notices, and ordered the company to reinstate Wyrick and Miller with back pay. We hold that there was substantial evidence on the record considered as a whole to support the Board's findings, and we enforce its order.

Wyrick and Miller were employed on separate crews, and there was evidence that they were known to be unhappy with Fuller's performance as Business Agent. On March 5, 1969, the company decided to reduce its sheet metal work force because of a jurisdictional dispute award, and both Wyrick and Miller were laid off. Wyrick was told that he had lost his job by Moyers, his crew foreman. At the hearing before the Trial Examiner, Moyers testified that Harvey, the acting general foreman, told him to lay off Wyrick and one Turner. Moyers went on to testify:

A Well, I told Bill Harvey, I says—concerning Henry Wyrick, I says, "I can understand maybe why this man's going to be laid off, but I can't understand the other one."

Q Now, by that statement, did you mean that Mr. Wyrick was not a good worker—or why did you make that statement?

A Well, the reason I made the statement was that Henry Wyrick—he didn't make any secret about the fact that he—well, he didn't have much use for the business agent [Fuller] at that time, you know, and he done a lot of talking on the job.

Another employee, Cox, testified that he overheard Moyers telling Wyrick

that he was going to lay him off, that he didn't want to because it wasn't his idea, it was from higher up, and he didn't pick him. He said he was one of the best workers that he had, and that he hated to do it.

The Trial Examiner and the Board credited this testimony and expressly refused to credit other testimony which tended to contradict it.

The layoff of Miller took place on the same day under similar circumstances. Bennett, Miller's crew foreman, testified that he selected Miller for lay off, instead of another crew member, because he continually wandered off from the job. But, according to Miller's testimony, Bennett told him that he had nothing to do with this decision. Cox testified that he and Miller had been warned by Ball, a union steward, not to campaign against Fuller on the job, and that when he saw Fuller at a union meeting:

> John [Fuller] told me that night he heard—that he had got a phone call and that me and Talmadge Miller had been campaigning on the job out there, and he said, "I told Talmadge Miller when he went to work out there to keep his mouth shut if he wanted to work"; and he said "I want you to keep your mouth shut; I want Talmadge Miller to keep his mouth shut." And he said, "You tell him, if you want to work at Oak Ridge"; and that was on a Friday night.

This testimony was directly contradicted by Fuller. The Trial Examiner and the Board credited Cox and declined to credit Fuller.

Wyrick testified that after the lay offs he and Miller went to see craft superintendent Graham, a company official:

> I asked Mr. Graham how come I got laid off and we sorta got talking and he said that he didn't have a thing to do with it, said that Mr. Fuller went over his head and had it done, picked the lay off.

Another dissident employee, Peace, quoted Graham to the same effect. Graham denied making such a statement, and McMahan, a general shop foreman who happened to be present at the time, testified that he could not remember whether such a statement had been made. The Trial Examiner and the Board credited Wyrick's and Peace's testimony, discredited Graham's, and observed that McMahan had not testified squarely on the point.

Wyrick also testified that he met with Fuller immediately after the interview with Graham, and that he accused Fuller of having him laid off. According to Wyrick, Fuller replied, "If I did have you laid off, what are you going to do about it?" Fuller denied ever having made such a statement. The Trial Examiner and the Board again credited Wyrick.

 Accordingly, there was substantial evidence in the record as a whole to support the Trial Examiner and the Board's credibility findings. Most of the testimony on both sides was given by interested parties (a notable exception is that of Cox), but that circumstance, by itself, is no reason to overturn the credibility assessments of the Board. If the Board were restricted to crediting testimony only from disinterested persons, in most cases it could reach no decision at all. Once the Board's factual findings are accepted, its conclusion that the lay offs were motivated by reasons impermissible under the Act follows logically. In campaigning against Fuller, Wyrick and Miller were engaging in activity protected under the Act, and the fact that they were laid off for this reason violates the Act. Radio Officers Union v. N.L.R.B., 347 U.S. 17, 40–42, 74 S.Ct. 323, 98 L.Ed. 455 (1954). Respondents point out that not all of Fuller's opponents were laid off, but this fact is not decisive. The punitive lay off of a single dissident may have—and may be intended to have—an *in terrorem* effect on others, and the Board need not wait until a party commits a gross violation before it may find any violation at all. N.L.R.B. v. Challenge-Cook Bros., 374 F.2d 147, 152 (6th Cir. 1967).

Respondents argue that the Trial Examiner and the Board so misapprehended the situation on the Oak Ridge job site that their findings are without sub-

stantial support. They point to several factual errors in the Trial Examiner's opinion, which was adopted *in toto* by the Board. Perhaps the Examiner did not fully understand the factual context. But none of the alleged errors goes to the heart of the case. None of them casts any doubt on the testimony, cited above, which was credited by the Trial Examiner. Even if the factional alignments within the union were not as clear-cut as the Trial Examiner's findings suggest, there was more than sufficient evidence that Wyrick and Miller were vocally opposed to the reelection of Fuller. There was sufficient evidence that this opposition was known both by Fuller and by company officials. The testimony about Graham suffices to prove the company's awareness. There was evidence from which the Board could find that this motive produced the decision on the part of union officials that Wyrick and Miller be laid off and that the company officials, knowing of this situation, acceded to the union's wishes. While we might have reached different conclusions from the same evidence if we were permitted to consider it *de novo*, we hold that there was sufficient evidence, on the record considered as a whole, to support the decision of the Board.

The order of the Board is enforced.