**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**PIPEFITTERS UNION LOCAL NO. 120, Respondent.**

No. 82–1296.

United States Court of Appeals, Sixth Circuit.

Argued June 22, 1983.

Decided Oct. 13, 1983.

As Amended Oct. 26, 1983.

Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Mark McCarty, argued, Washington, D.C., for petitioner.

Anthony W. Hackenberg, Lawrence M. Oberdank and Thomas R. Skulina, Cleveland, Ohio, for respondent.

Before CONTIE, Circuit Judge, and PHILLIPS and CELEBREZZE, Senior Circuit Judges.

CONTIE, Circuit Judge.

The National Labor Relations Board (Board) petitions for enforcement of its order which, among other things, directs Pipe Fitters Union Local No. 120 (Union) to cease and desist from unfair labor practices in violation of §§ 8(b)(1)(A) and 8(b)(2) of the National Labor Relations Act (Act), 29 U.S.C. § 158(b). The Board's order issued on February 22, 1982 and is reported at 260 N.L.R.B. 392. This court has jurisdiction to hear this appeal under 29 U.S.C. § 160(e).

## I.

The Union represents journeymen pipefitters in the construction trade in and around Cleveland, Ohio and is affiliated with the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL–CIO (United Association). The employer, Schweizer Dipple, Inc., is a mechanical contractor who, in the fall of 1978, was engaged in the installation of piping and mechanical equipment at a nuclear power plant construction site in Perry, Ohio. The employer is also a member of the Mechanical Contractors Association of Cleveland, Ohio, a multiemployer bargaining group representing contractors in the mechanical piping industry and a signatory to the collective bargaining agreement with the Union. The collective bargaining agreement was administered by a Joint Conference Committee consisting of five representatives from the Mechanical Con-

tractors Association and five representatives from the Union. The Committee also had the authority to amend the agreement.

During the construction of the Perry nuclear power plant, the Union determined that it could not meet the demands of local contractors for qualified welders who also possessed pipefitting skills. In order to alleviate this shortage, several Union representatives sought to establish a program to provide qualified welders with advanced welding and pipefitting training. After receiving approval from the United Association, the Union presented its proposal to the Joint Conference Committee, who accepted it on October 18, 1978. The Committee did not expressly incorporate the program into the collective bargaining agreement.

The Union's proposal called for the establishment of a four-year training program which would be financed by a local trust fund administered by management and union trustees. The Union recruited qualified welders for the program and referred them to Schweizer Dipple for employment. The employer agreed to hire the trainees for the duration of the training program and to pay them the same wages and benefits as received by journeymen pipefitters. The trainees were also placed on probation for six months to qualify for union membership. Upon completion of this probationary period, the trainees would receive their metal trades journeyman cards and would continue their training for three and one-half years. The trainees who completed this training would be upgraded to the status of building trades journeymen without having to take the examination which was normally required for such a promotion.[1]

In November 1978 and January 1979, respectively, Peter Dades and Joseph Bevaque passed the certified welder's examination and executed an agreement with the Union to participate in the training program. Both men were then referred to Schweizer Dipple for employment. The agreement which the two men signed reads as follows:

I, . . . . . . . . . . . . . . . . . . . . . . . . . residing at,
            (Name)
. . . . . . . . . . . . . . . . . . . . . agree that in con-
        (Address)
sideration of the opportunity to become a journeyman member of the United Association through its welding training facility, agree that I will work on the job to which I am assigned by the local union until such time as I become unemployed by normal lay-off. I understand that I will be working on probationary status for the first six months period, and that upon successful completion of this period, and approval by the union, I will become a member of Local Union # . . . . . . . . . ., I further understand all the obligations of union membership and that I will be required to attend such night instructional sessions as established by the union. I execute this waiver willingly and without reservation.

. . . . . . . . . . . . . . . . . . . . .
            (Signature)
. . . . . . . . . . . . . . . . . . . . .
            (Date)

All trainees were given white tickets which enabled them to work at the Perry construction site without being union members. The trainees were also assessed normal union dues and a monthly administrative fee.

The first series of training classes began in March 1979 and continued through May of that year. The record indicates that Dades and Bevaque regularly attended these classes. In late May, however, Dades and Bevaque became disenchanted when the Union failed to confer memberships upon other trainees who had completed their probationary periods. Thereafter, a petition was circulated by the trainees which alleged that the Union was not honoring its commitment to provide Union memberships. In June 1979, Carl Gauntner, a Union business representative, met with the trainees and explained that the memberships were being delayed due to processing difficulties at the United Association's Washington D.C. office. Gauntner assured them, however, that the memberships would be forthcoming.

By the time the second series of classes began in October 1979, the Union still had

---

**1.** A building trades journeyman card is highly valued because it allows its holder to seek work in any jurisdiction. In contrast, a metal trades journeyman cannot obtain work outside of his local's jurisdiction.

provided no memberships to the trainees. Several trainees, including Dades and Bevaque, expressed their dissatisfaction by refusing to attend the training classes. Thereafter, the training program coordinator notified Gauntner of the absences. Gauntner instructed the union steward at the Perry site to notify the delinquent trainees that they were not abiding by the contract they had signed and that the Union would not tolerate repeated absences. Despite two separate warnings, Dades and Bevaque did not return to their training classes.

In May 1980, Gauntner met with the employer's president, Andrew Martin, and the general foreman at the Perry site, Ed McFaul. During this meeting Gauntner discovered that the employer intended to lay off approximately 20 employees for economic reasons. Gauntner indicated that there were several trainees who should be terminated for their failure to attend the training classes. Such terminations, Gauntner explained, would "set an example to the other people." Martin agreed with this suggestion and discharged Dades and Bevaque on May 27, 1980. The record indicates that Bevaque was rehired by Schweizer Dipple in August 1980 and became a union member in October 1980. Dades was also rehired by Schweizer Dipple in July 1980, but has not obtained a union membership. The employer continues, however, to deduct union dues from Dade's paycheck.

Based on the foregoing facts, the Board ruled that the Union had violated §§ 8(b)(1)(A) and 8(b)(2) of the Act by inducing the employer to discharge Dades and Bevaque for their failure to attend the training sessions. The Board indicated that the training session attendance requirement was not the product of an agreement between the Union and the employer, but rather was an internal union regulation. *Pipefitters Union Local No. 120,* 260 N.L.R.B. 392, 396 (1982). The Board also ruled that the Union violated § 8(b)(1)(A) "by charging Dades and Bevaque dues and fees at times, including their probationary periods, during which they were not members of the Union." *Id.* at 392 n. 4. The Board now seeks enforcement of its order. 29 U.S.C. § 160(e).

## II.

### A.

■ We recognize at the outset that the Board's decision is subject to limited judicial review. *NLRB v. Weingarten, Inc.,* 420 U.S. 251, 266–67, 95 S.Ct. 959, 968–969, 43 L.Ed.2d 171 (1975). "The rule which the Board adopts is judicially reviewable for consistency with the Act, and for rationality, but if it satisfies those criteria, the Board's application of the rule, if supported by substantial evidence, must be enforced."[2] *Beth Israel Hospital v. NLRB,* 437 U.S. 483, 501, 98 S.Ct. 2463, 2473, 57 L.Ed.2d 370 (1978); *Thomas Industries, Inc. v. NLRB,* 687 F.2d 863, 866 (6th Cir.1982). The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951). Although we are not free to substitute our judgment for that of the Board simply because we would have made a different decision had we heard the case *de novo, Thomas Industries, Inc. v. NLRB,* 687 F.2d at 866, we are also not "to stand aside and rubber stamp" Board determinations that run contrary to the language or tenor of the Act. *NLRB v. Weingarten, Inc.,* 420 U.S. at 266, 95 S.Ct. at 968. Accordingly, we must review the evidence unfavorable to the Board's position as well as evidence supporting it.

### B.

■ Section 8(b)(1)(A) of the Act makes it an unfair labor practice for a union to "restrain or coerce" employees in the exercise of their § 7 rights. 29 U.S.C. § 158(b)(1)(A). Section 8(b)(2) makes it an unfair labor practice for a union to cause an

---

**2.** *See* 29 U.S.C. § 160(e).

employer to discriminate against an employee "with respect to whom membership in such [labor] organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership." 29 U.S.C. § 158(b)(2). These sections do not, however, prohibit all forms of coercion by a union to prevent the exercise of an employee's organizational rights. *See NLRB v. Allis-Chalmers Mfg. Co.,* 388 U.S. 175, 195, 87 S.Ct. 2001, 2014, 18 L.Ed.2d 1123 (1967). Specifically, the Supreme Court has held that "Congress did not propose any limitations with respect to the internal affairs of unions, aside from barring enforcement of a union's internal regulations to affect a member's employment status." *Id.* As a result, a union is permitted to expel members or assess fines in order to enforce an internal regulation, but may not enforce its regulation by inducing the employer to exclude an employee from the work force without triggering violations of §§ 8(b)(1)(A) and 8(b)(2). *NLRB v. Boeing Co.,* 412 U.S. 67, 73, 93 S.Ct. 1952, 1956, 36 L.Ed.2d 752 (1973); *Scofield v. NLRB,* 394 U.S. 423, 428–29, 89 S.Ct. 1154, 1157–1158, 22 L.Ed.2d 385 (1969); *NLRB v. Allis-Chalmers Mfg. Co.,* 388 U.S. at 195, 87 S.Ct. at 2014. In this way, the Act insulates employees' jobs from their organizational rights. *Radio Officers' Union v. NLRB,* 347 U.S. 17, 40, 74 S.Ct. 323, 335, 98 L.Ed. 455 (1954); *International Union of Operating Engineers Local 406 v. NLRB,* 701 F.2d 504, 508 (5th Cir.1983); *Local Union No. 948, International Brotherhood of Electrical Workers v. NLRB,* 697 F.2d 113, 116 (6th Cir.1982).

■ In this case, the Board found that the training session attendance requirement was an internal Union regulation and not the product of an agreement between the Union and the employer. As a result, the Union violated §§ 8(b)(1)(A) and 8(b)(2) by inducing the employer to fire Dades and Bevaque for their failure to comply with this regulation. *See, e.g., NLRB v. Laborer's Intern. Union of No. America,* 649 F.2d 33, 35–36 (1st Cir.1981); *Rust Engineering Co. v. NLRB,* 445 F.2d 172, 174–75 (6th Cir.1971). While the Board's holding is not without force, we believe it is not supported by substantial evidence on the record as a whole.

In its analysis, the Board virtually ignored the fact that the Union had to present its training program to the Joint Conference Committee for its approval. This fact alone suggests that the attendance requirement was more than merely an internal union regulation. Receipt of the Committee's approval was an absolute requirement because the employer had to participate with the Union in order for the program to succeed. The record indicates that the Committee approved the entire program, including the required training sessions. That the program was not formally incorporated into the collective bargaining agreement is not dispositive of whether a side-agreement existed between the Union and the employer. *Cf. Hamilton Foundry & Machine Co. v. International Molders & Foundry Workers,* 193 F.2d 209, 214 (6th Cir.1951), *cert. denied,* 343 U.S. 966, 72 S.Ct. 1060, 96 L.Ed. 1362 (1952) (oral collective bargaining agreements permitted under 29 U.S.C. § 158(d) where neither party requests written instrument).

We also believe that the Board did not give sufficient weight to the employer's training program obligations, which provide further evidence that the employer expected the trainees to attend the classes. The employer was obligated to employ the trainees for the duration of the four-year training program and to pay them the same wages and fringe benefits as journeymen pipefitters. In this context, it strains credulity to believe that the employer would willingly incur such an economically burdensome commitment without expecting that the trainee-welders would develop their pipefitting skills through the training classes. This sentiment is evidenced by the testimony of Schweizer Dipple's president, Andrew Martin:

Q: What wage rates were the welders being paid?

Martin: Being paid full journeymen rates.

Q: Does Schweizer Dipple have any interest in seeing that they acquire the other skills necessary to be a pipefitter?

Martin: Yes, we had a great interest.

Q: Would you explain to the Judge what your interest was?

Martin: Well, we are paying full journeymen rates. In most cases someone who has only one of the skills of a pipefitter which is the welding skill, the way we break up our people into gangs, work groups, of maybe eight to ten people, I am in a situation where I may have five fitters or four welders or five and five— we are pretty lopsided—almost equaled up.

.    .    .    .    .

When all the man theoretically can do is weld, he can't do and help assemble pipe and things like that. So we would like him to be able to do all these things, not just sit there like a machine ready to weld the joint up.

I am not getting into individuals now. I am saying generally. If a man is only able to weld, we are paying a full price for a man that can't produce a full day's work unless he has nothing but welding to do.

The record also indicates that, on several occasions, management personnel asked Union representatives to commence the training program because the trainees' lack of pipefitting skills made them ineffective and possibly unsafe workers. While it is undisputed that the training program was under the exclusive control of the Union and that the employer was, at times, extremely apathetic toward the trainees' failure to attend class, we are convinced that the attendance requirement was far more than an internal union regulation because the employer had a substantial interest in requiring the trainees' attendance at the training sessions as part of its agreement with the Union. Accordingly, the Board's finding that the Union violated §§ 8(b)(1)(A) and 8(b)(2) is not supported by substantial evidence and we deny enforcement of that portion of the Board's order.

### C.

The Board also ruled that the Union violated § 8(b)(1)(A) by assessing dues and fees against Dades and Bevaque during and after their probationary periods while not permitting them to join the Union.

The record indicates that the existing collective bargaining agreement contained a "union shop" clause under which all employees were required to join and remain members of the Union as a condition of employment. Although such a provision is authorized by the first proviso of § 8(a)(3),[3] the Supreme Court has indicated that the burdens of union "membership" are expressly limited to the payment of initiation fees and monthly dues:

> It is permissible to condition employment upon membership, but membership, insofar as it has significance to employment rights, may in turn be conditioned only upon payment of fees and dues. "Membership" as a condition of employment is whittled down to its financial core.

*NLRB v. General Motors Corp.,* 373 U.S. 734, 742, 83 S.Ct. 1453, 1459, 10 L.Ed.2d 670 (1963). The *General Motors* Court ultimately ruled that an "agency shop" clause, which requires both union members and non-members to pay union dues and initiation fees, "conditioned employment upon

---

**3.** § 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3), provides in pertinent part:

(a) It shall be an unfair labor practice for an employer—

.    .    .    .    .

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided,* That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, . . . .

the practical equivalent of union 'membership,' as Congress used that term in the proviso to § 8(a)(3) ....", *id.* at 743, 83 S.Ct. at 1459, and thus was permissible under the Act.

While the *General Motors* decision reaffirmed a union's right under § 8(a)(3) to condition a worker's employment upon the payment of union dues and fees, the Court's decision was limited to a situation in which union membership was made available at the workers' option. *NLRB v. General Motors Corp.*, 373 U.S. at 737, 83 S.Ct. at 1456. Indeed, the Court specifically refrained from deciding whether a union could assess dues and fees from an employee while affirmatively denying union membership. *Id.* at 744–45 n. 12, 83 S.Ct. at 1460 n. 12.

Although we find the Board's decision to be overbroad insofar as it condemns the union's collection of dues and fees during the probationary period, we believe the remainder of the Board's ruling that a union violates § 8(b)(1)(A) by assessing dues and fees from an employee while affirmatively denying union membership is a fair and reasoned application of the Act. *Beth Israel Hospital v. NLRB*, 437 U.S. at 501, 98 S.Ct. at 2473. During the probationary period, the trainees simply had no entitlement to union membership. In addition, the Union did nothing to suggest that it would not confer memberships upon the trainees at the end of this period. Accordingly, the Board's finding that the Union violated § 8(b)(1)(A) by assessing dues and fees against Dades and Bevaque *during* their probationary periods is not supported by substantial evidence.

When the probationary period ended, however, the Union did not confer memberships upon the two trainees even though they had met the requirements for union membership and had both expressed a desire to join. As a result, the two men continued to pay union dues, but could not attend union meetings, vote upon ratification of agreements negotiated by the Union, or participate in other internal union affairs. That the memberships were merely delayed, as alleged by the Union, is irrelevant. A union should not, under the circumstances here presented, be entitled to exact dues from employees after refusing to accept them into its ranks. *See Local 1104, Communications Workers of America v. NLRB*, 520 F.2d 411, 419 (2d Cir.1975), *cert. denied*, 423 U.S. 1051, 96 S.Ct. 778, 46 L.Ed.2d 639 (1976); *Los Angeles Paper Handlers Union No. 3*, 188 N.L.R.B. 420, 424 (1971); *Local 4186, United Steelworkers of America*, 181 N.L.R.B. 992, 992 (1970). Such conduct constitutes a continuing form of coercion tending seriously to restrain Dades and Bevaque in the exercise of their § 7 rights. As a result, the Board's finding that the Union violated § 8(b)(1)(A) by assessing dues and fees against the two trainees *after* their probationary periods is supported by substantial evidence.

Accordingly, the Board's application for enforcement of its order is GRANTED IN PART and DENIED IN PART.