**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

and

**Amalgamated Clothing and Textile Workers Union, AFL–CIO–CLC, Intervenor,**

v.

**AMERICAN OLEAN TILE COMPANY, INC., Respondent.**

No. 86–5308.

United States Court of Appeals, Sixth Circuit.

Argued March 9, 1987.

Decided Aug. 13, 1987.

Rehearings and Rehearings En Banc Denied Oct. 15, 1987.

Elliott Moore, Deputy Associate General Counsel, N.L.R.B., Washington, D.C., Susan L. Williams (argued), William R. Stewart, Emil C. Farkas, Director, Region 9, N.L.R.B., Cincinnati, Ohio, for petitioner.

Arthur R. Donovan, Larry R. Downs, Kahn, Dees, Donovan, Kahn, Evansville, Ind., William Michael Schiff, Evansville, Ind., J. Alan Lips (argued), Taft, Stettinius & Hollister, Cincinnati, Ohio, for American Olean Tile.

Irwin H. Cutler, Jr. (argued), Louisville, Ky., for intervenor.

Before LIVELY, Chief Judge, BOGGS, Circuit Judge, and CELEBREZZE, Senior Circuit Judge.

LIVELY, Chief Judge.

This case concerns the reemployment rights, respectively, of employees who offer to return to work during an economic strike and those who offer to return after the strike ends. The specific question is whether an employer may continue, after the strike ends and all employees are prepared to return, to recall employees from a chronological list based on the date of an unqualified offer to return to work, when this procedure results in a preference for early offerors over some late offerors with greater plant seniority.

### I.

American Olean Tile Company (the employer) manufactures ceramic tile at plants in Lewisport and Cloverport, Kentucky. The plants are located approximately twenty miles apart, and constituted a single bargaining unit for collective bargaining purposes. Employees at both plants were represented by the Amalgamated Clothing and Textile Workers Union under a single agreement that expired on June 16, 1978. Upon expiration of the collective bargaining agreement the employees at both plants began an economic strike, and by

December 1978 all jobs had been filled with permanent replacements.

Beginning in mid-January 1979 striking employees, individually and in small groups, made unconditional offers to return to work. Since there were no openings at this time the employer placed these employees on a preferential hiring list in chronological order based on the date and time of individual requests to return to work. When several employees made such a request as a group, they were placed on the chronological list as a unit and listed within the unit according to their pre-strike seniority. The requesting employees were advised that there were no openings and that they would be recalled as vacancies occurred. They were also told that vacancies would probably occur first at Lewisport, but that returning Cloverport employees who accepted positions at Lewisport and desired to return to Cloverport would be transferred there when vacancies occurred.

On January 23, 1979, approximately 31 employees were on the recall list. That evening the striking employees met and voted to end the strike and unconditionally offer to return to work. This information was conveyed to the manager of both plants by union officials in a telephone call between 1:00 and 2:00 a.m. on January 24 and by a telegram delivered between 9:00 and 10:00 a.m. that day. Prior to the delivery of the telegram an additional nine or ten employees individually made unconditional offers to return. These employees were given the same information as those who had offered to return during the strike, including the possibility of ultimate transfers to Cloverport for former Cloverport employees who accepted positions at Lewisport.

Although the employer disputed this fact, it appears that those who offered to return to work after the union's notification were placed on two lists, one for Lewisport and one for Cloverport, according to pre-strike seniority. The employer contends that the January 24 post-telegram offerors were treated exactly the same as employees who offered earlier to return in groups; they were placed chronologically according to the date of the group offer (January 24) and were ranked within the group by seniority.

The union did not object to the chronological recall of employees who offered to return prior to the union's telephone notification in the early hours of January 24. However, it did object to any employees who made offers to return after 1:00 a.m. on that date being placed on a preferential recall list based on chronology. It contended that "all employees who had not made individual offers to return to work before 1:00 a.m. on January 24 should be placed on the hiring list in their order of seniority."

## II.

The union filed an unfair labor charge based solely on the reinstatement of twelve employees, seven of whom offered to return to work prior to the vote to end the strike and five of whom offered after the vote but prior to delivery of the telegram. All twelve were former Cloverport workers, and all were recalled to the Lewisport plant in the order of their offers to return to work. As openings occurred at Cloverport the twelve were transferred there ahead of more senior Cloverport employees whose names had not been reached on the chronological list. The union charged that this action by the employer constituted a violation of sections 8(a)(1) and (3) of the National Labor Relations Act, as amended, 29 U.S.C. §§ 158(a)(1) and (3), "by discriminating in regard to the terms and conditions of employment of formerly striking employees."

Following a hearing an administrative law judge (ALJ) held that the twelve former Cloverport employees were granted an unlawful preference by being transferred to jobs substantially equivalent to their former employment while more senior strikers were awaiting reinstatement to their former positions or to substantially equivalent ones. The ALJ found that the employer had formerly filled vacancies at the plants on a seniority basis and that it returned to that method when the strike ended with

respect to those who applied for reinstatement after the union's telegram was received. The ALJ found there was no showing of an anti-union motivation, but that this preference was inherently destructive of the rights of senior striking employees and thus, unlawful, even without a showing of union animus. The finding of an unlawful preference was based on the ALJ's determination that the twelve employees were not fully reinstated when they were recalled to work at Lewisport but only when they were transferred to Cloverport. Under this reasoning, a move which the employer considered a transfer in accordance with procedures adopted during the strike, became a discriminatory reinstatement because it occurred after the strike ended.

The ALJ also ruled on an issue raised by the employer. The charge was filed by the union on November 21, 1979, and the employer contended that it was untimely under section 10(b) of the Act, 29 U.S.C. § 160(b), which limits Board consideration to events occurring within six months of the filing of a charge. The employer argued that the union had knowledge of its practice of recalling employees on the basis of the chronological list at least as early as January 1979 and that the November filing was untimely. Further, the twelve employees were recalled to Lewisport between January 15 and April 2, 1979, and thus these activities were outside the six-month limitations period. The ALJ decided this issue consistently with his view that reinstatement did not take place until each of the twelve employees began working at Cloverport. Since the first transfer of one of the twelve from Lewisport to Cloverport occurred on June 20, 1979, the ALJ concluded that the November 21 charge was timely.

The ALJ ordered a comprehensive remedy. The Board overruled the employer's exceptions, affirmed the ALJ's decision and adopted the recommended order with one modification, 265 NLRB 1625 (1982). The Board now seeks enforcement of its decision and order.

## III.

An employer may hire permanent replacements during an economic strike, and is not required to discharge the replacements to make room for strikers who desire to return to work. Economic strikers who unconditionally apply for reinstatement are entitled to reinstatement when replacements leave the strikers' former positions or when vacancies occur for which they are qualified. *N.L.R.B. v. Fleetwood Trailer Co.*, 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967); *Arlington Hotel Co. v. N.L.R.B.*, 785 F.2d 249 (8th Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 314, 93 L.Ed.2d 288 (1986). The right to reinstatement does not expire if there are no vacancies for which the striker is qualified when he first applies. The request must be treated as a continuing one until the striker has obtained "other regular and substantially equivalent employment." *Fleetwood Trailer*, 389 U.S. at 380–81, 88 S.Ct. at 547; *Laidlaw Corp.*, 171 N.L.R.B. 1366, 1369–70 (1968), *enforced*, 414 F.2d 99 (7th Cir.1969), *cert. denied*, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100 (1970). In determining which of its striking employees will be reinstated upon request and which will have to wait, an employer may resort "to any one of a number of methods" as long as a method is not chosen "with the purpose to discriminate against those most active in the union." *N.L.R.B. v. MacKay Co.*, 304 U.S. 333, 347, 58 S.Ct. 904, 911, 82 L.Ed. 1381 (1938).

Since the twelve strikers were qualified to fill the vacancies at Lewisport, the employer was required to offer them these positions as they opened. The employer recalled strikers for positions at Lewisport in chronological order of their offers to return to work, and the union did not contest these appointments. However, the Lewisport positions were not substantially equivalent to those the returning strikers had previously held at Cloverport. When vacancies occurred in substantially equivalent positions at Cloverport, the twelve strikers were transferred to those positions, again in chronological order. The union argued that these transfers discriminated against strikers who made their un-

conditional offers after delivery of the telegram, imposing an unlawful burden on concerted activities and discouraging union membership. The ALJ agreed, finding such employer action "inherently destructive" of employee rights, thus eliminating any requirement that the union show anti-union motivation.

The first reference to the "inherently destructive" standard appeared in *N.L.R.B. v. Erie Resistor Corp.*, 373 U.S. 221, 228, 83 S.Ct. 1139, 1145, 10 L.Ed.2d 308 (1963). After discussing situations in which a charging party makes a showing that an employer intended to encroach upon protected rights, the Court stated:

> The outcome may well be the same when intent is founded upon the inherently discriminatory or destructive nature of the conduct itself. The employer in such cases must be held to intend the very consequences which foreseeably flow from his actions and if he fails to explain away, to justify, or to characterize his actions as something different than they appear on their face, an unfair labor practice charge is made out.

*Id.* (Citations omitted). The standard was applied again in *N.L.R.B. v. Brown*, 380 U.S. 278, 287, 85 S.Ct. 980, 986, 13 L.Ed.2d 839 (1965), and *American Ship Building Co. v. N.L.R.B.*, 380 U.S. 300, 311, 85 S.Ct. 955, 963, 13 L.Ed.2d 855 (1965).

### IV.

### A.

This case is different from others where an unfair labor practice finding was based upon the inherently destructive nature of the employer's actions. No positions were filled with new hires after unconditional offers were received. The employer did not deny reinstatement to unconditional offerors or withhold reinstatement until a vacancy occurred in a substantially equivalent position; strikers were reinstated when any position opened for which they were qualified. The employer did not grant superseniority to non-strikers, or refuse to pay strikers vacation pay while offering it to striker replacements. These are the types of employer action that have been held inherently destructive of employee rights. See *N.L.R.B. v. Great Dane Trailers, Inc.*, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967); *Erie Resistor Corp.*, supra.

Since turnover was much greater at Lewisport than at Cloverport, all recalls were initially to the Lewisport plant. The very use of a chronological list for recall created a preference for those who applied early for reinstatement. The union appears to agree that this preferential treatment was lawful while the strike was in progress, and the decision in *MacKay Co.* seems to support this conclusion. The union's position is that while use of the chronological list to recall strikers to Lewisport was permitted, it was unlawful to extend this preferential treatment by timing transfers of employees to their former positions or substantially equivalent ones at Cloverport on the basis of the same list after the strike had ended. Instead, the union argues, employees already recalled from the chronological list should have been transferred to Cloverport only when there were no unreinstated employees with greater Cloverport pre-strike seniority available to fill the positions, regardless of their place on the chronological list. It was admitted that there were former Cloverport workers with greater seniority than any of the twelve transferees who had made unconditional offers to return but who had not been reached for reinstatement on the chronological list at the time of the transfers.

■ There is no right to recall according to seniority in the absence of such a provision in a collective bargaining agreement or "a binding established past practice." In the absence of such a right, an employer may establish a new recall procedure so long as it is "applied consistently." *Lone Star Industries, Inc.*, 279 N.L.R.B. No. 78, 1985–86 CCH NLRB ¶ 17,980 at 30,889. The employer asserts that it did apply the chronological recall procedure consistently, and there was no basis in the collective bargaining agreement or binding past practice for requiring recalls by seniority. The employer also points out that all employees on the list were recalled chronologically

and there was no complaint from the union about the recall procedure until the twelve strikers were transferred to Cloverport. It contends that the transfer of the twelve was in accord with the representation made to all offerors, both during the strike and after it ended. All who made unconditional offers to return were treated the same way. The transfers were part of the process of recall adopted when the strike was in progress and served a legitimate business purpose.

■ At oral argument the attorney for the union contended that while use of the chronological list was lawful during the strike, its use after the strike ended was illegal. Counsel argued that during the strike the "defectors" were the only employees available to fill the vacancies, but once the strike ended the employer did not need the incentive of an early restoration to a striker's previous job in order to maintain its work force. No authority was cited for the proposition that an employer must abandon a legally devised and consistently applied recall procedure once a strike ends, and the Board did not rest its decision on this distinction. We decline to adopt such a rule.

### B.

The question as formulated by the ALJ is whether the reinstatement of the twelve employees took place when they were recalled for jobs at Lewisport or when they were transferred to Cloverport. If it took place at the recalling, their reinstatement did not discriminate against other strikers; it merely applied a logical procedure of giving jobs as they opened to applicants in the chronological order of their offers to return to work. Since every offeror was recalled on the same basis, there was nothing "inherently discriminatory or destructive" in this conduct. *Erie Resistor*, 373 U.S. at 228, 83 S.Ct. at 1145. If reinstatement occurred only when the strikers were returned to their former positions or substantially equivalent ones at Cloverport as the Board determined, use of the chronological list served no purpose except to prefer strikers who abandoned the strike over those who continued to the end.

It is difficult to understand how a procedure that was admittedly lawful during the strike became inherently destructive of the rights of employees with greater seniority when the strike ended. The union and the employer had not bargained for all recalls to be based on seniority. Since the employer was free to adopt "any number of methods" for determining the order of recall, *MacKay Co.*, 304 U.S. at 347, 58 S.Ct. at 911, all strikers put any anticipation of recall according to seniority at risk when they joined the strike. The employer chose to consider seniority in recalling employees only for the purpose of ranking offerors within groups that requested reinstatement together and thus had the same chronological position on the roster. This procedure was followed both before and after the strike ended.

■ We conclude that the reinstatement of the twelve employees occurred when they were recalled to work at Lewisport and the transfers to Cloverport merely completed the process adopted by the employer and communicated to the offerors. The law requires reinstatement when a vacancy occurs for which an offeror is qualified, whether in his previous position or a substantially equivalent one, or not. *Fleetwood Trailer*, 389 U.S. at 381, 88 S.Ct. at 547. The ALJ's construction would permit an employee to decline an offer of reinstatement to a position for which he was merely qualified and later demand reinstatement to his former position or a substantially equivalent one when it became vacant. This would upset the balance of interests sought to be served by court-created rules relating to reinstatement. Only employees who make unconditional offers to return to work are entitled to reinstatement. In the situation presented by this case, an unconditional offer required an employee to make himself available for recall to any job within the bargaining unit—that is, at either plant—for which he was qualified. Since all employees were reinstated on the same basis—from the chronological list—it is immaterial that some more

senior Cloverport employees were still awaiting reinstatement at the time previously reinstated employees were transferred from Lewisport to Cloverport.

■ There is no evidence that the employer prepared and used the chronological list "with the purpose of discriminating against those most active in the union." *MacKay Co.*, 304 U.S. at 347, 58 S.Ct. at 911. The chronological list had the legitimate business purpose of providing a fair and orderly method of dealing with strikers who desired to return to work as the employer endeavored to continue operating. While the list created a preference based on the time when an employee made the unconditional offer to return, it made no distinction between those who offered during the strike and those who did so after it ended. The procedure was consistently applied, and seniority—the issue emphasized by the ALJ—played the limited role of ranking people who were otherwise in the same position on the chronological list.

We conclude that the Board erred in holding that the transfer of twelve previously reinstated employees to Cloverport in accordance with the chronological list while employees with greater pre-strike seniority at Cloverport were awaiting reinstatement because of their lower positions on the same list constituted an unlawful preference in violation of sections 8(a)(1) and (3).[1]

The record with respect to the section 10(b) issue was not fully developed, but it is not necessary to decide that issue in view of our decision on the merits.

Enforcement of the Board's order and decision is denied.

CELEBREZZE, Senior Circuit Judge, dissenting.

The National Labor Relations Board ("NLRB" or "Board") seeks enforcement of its Decision and Order that found American Olean Tile Company ("Company") in violation of section 8(a)(1) and (3) of the

National Labor Relations Act ("Act"), 29 U.S.C. § 158(a)(1) & (3) (1982), for granting poststrike preferential reinstatement rights to twelve permanently replaced employees who abandoned an economic strike or made individual offers to return to work. I conclude, contrary to the majority, that the Board properly held that the right to reinstatement continues until the returning strikers have been offered their former or substantially equivalent positions. I further conclude that the Board reasonably determined that the preferences granted in this case were "inherently destructive" of the rights of full-term strikers. Accordingly, I dissent.

## I.

The majority's refusal to enforce the Board's Decision and Order is due primarily to its disagreement with the Board's determination of the scope of the returning strikers' right to reinstatement. The relative rights to reinstatement as between the twelve abandoning strikers and the full-term strikers are crucial to resolving the issue before us because to find a violation of section 8(a)(3) of the Act, the Board must first find, *inter alia,* that the employer discriminated between its employees. *See NLRB v. Great Dane Trailers, Inc.,* 388 U.S. 26, 32, 87 S.Ct. 1792, 1796, 18 L.Ed.2d 1027 (1967); 29 U.S.C. § 158(a)(3) (1982). The Board, adopting the ALJ's decision, held that returning strikers are not fully reinstated until the strikers are returned to their former positions or substantially equivalent ones. As applied to the instant case, neither the twelve nor the full-term strikers had yet been returned to substantially equivalent positions, so when substantially equivalent jobs opened at Cloverport, the two groups had an equal right to reinstatement there. The Board concluded, therefore, that the Company necessarily discriminated against the full-term strikers by preferentially reinstating the twelve abandoning strikers to Cloverport.

---

**1.** The dissent would grant enforcement without adopting either the rationale of the Board or the arguments of the union. The dissent disagrees with this opinion on the question of when reinstatement took place. In effect, it treats the

recall of former strikers to jobs for which they were qualified as a gratuitous act by the employer rather than an obligation imposed by law. The case law does not support this view.

The majority, however, holds that the twelve abandoning strikers were fully reinstated when they were recalled to less than substantially equivalent positions at Lewisport. The premise underlying this holding is that the returning strikers' have the right to be reinstated only to positions for which they are qualified, regardless of whether the jobs are substantially equivalent to their prestrike positions. Once returning strikers are "reinstated" to such positions, the majority assumes that the employer is free to transfer the reinstated strikers between positions.[1] Thus, under the majority's view, the Company did not discriminate against the full-term strikers by transferring the twelve to substantially equivalent positions at Cloverport; the full-term strikers, who were not yet reinstated, did not have an equal right to the Cloverport positions. Under this theory, if any discrimination occurred, it must have been when the twelve were initially recalled to Lewisport, an issue not now before the court.[2]

In my view, the majority's holding misconstrues the law of reinstatement rights to the detriment of workers who choose to engage in a lawful strike. First, I note that the only authority cited by the majority supports neither its holding that returning strikers are fully reinstated upon accepting positions for which they are qualified, but which are not substantially equivalent positions, nor the corollary that returning strikers who refuse such offers lose their right to reinstatement. In *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967), the Supreme Court addressed the rights of returning economic strikers who had been permanently replaced during the strike, and held that "[i]f and when a job for

which the striker is qualified becomes available, he is *entitled to an offer* of reinstatement." *Id.* at 381, 88 S.Ct. at 547 (emphasis added). The majority, however, cites *Fleetwood Trailer* for the proposition that "[t]he law *requires reinstatement* when a vacancy occurs for which an offeror is qualified, whether in his previous position or a substantially equivalent one, or not." Maj. Op. at 1501 (emphasis added). The majority thus transforms an "entitlement to an offer" into a "requirement" that the employee accept such an offer. In my view, this extension of *Fleetwood Trailer* is unwarranted. *Fleetwood Trailer* never suggested that it was exhaustively delineating the rights of returning strikers. Rather, the Court was only announcing the minimum duty that an employer owes to permanently replaced strikers upon termination of an economic strike. *See also Laidlaw Corp. v. NLRB*, 414 F.2d 99, 103–06 (7th Cir.1969) (right to reinstatement continues until permanent replacement departs from striker's prestrike position), *enforcing*, 171 N.L.R.B. 1366 (1968), *cert. denied*, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100 (1970).

Moreover, the "entitlement to an offer" which the Court announced in *Fleetwood Trailer* was clearly intended to protect those employees who exercised their statutory right to strike. *See Fleetwood Trailer*, 389 U.S. at 378–81; *Laidlaw*, 414 F.2d at 102–05; 29 U.S.C. § 157 (1982); *see also MCC Pacific Valves*, 244 N.L.R.B. 931, 934 (1979) (characterizing *Fleetwood Trailer* and *Laidlaw* as "legal precedent which protects the rights of unreinstated strikers"), *enforced in part*, 665 F.2d 1053 (9th Cir. 1981). In my opinion, the majority's transformation of this "entitlement" into a "re-

---

1. Dicta in at least one NLRB decision lends some support to the conclusion that fully reinstated strikers may be preferred to unreinstated strikers.

   We recognize that not every job opening is one that an unreinstated striker, though qualified, is *entitled* to fill. There may be circumstances, for example, in which the rights of unreinstated strikers may conflict with the rights of those strikers who *have* been reinstated....

*MCC Pacific Valves*, 244 N.L.R.B. 931, 934 n. 15 (1979) (emphasis in original), *enforced in part*, 665 F.2d 1053 (9th Cir.1981). As will be discussed below, however, in the Board's view, full reinstatement does not occur until the strikers return to their former or substantially equivalent positions.

2. The initial recalls to Lewisport occurred outside the six month statute of limitations period applicable to unfair labor practice charges. *See* 29 U.S.C. § 160(b) (1982).

quirement" departs significantly from the employee-protection rationale underlying the cited cases and the Act. *See* 29 U.S.C. §§ 141(b), 151 (1982). Under the majority's rule, if returning strikers refuse reinstatement to positions less than substantially equivalent to their prestrike jobs, no matter how undesirable, they forever lose their right to reinstatement. By so limiting the employees' rights, the majority grants the employer a powerful weapon that can be used to punish returning strikers for engaging in concerted activities. This potential for abuse is too great to be reconciled with the purposes of the Act.

The "potential" for abuse, however, is not merely the product of conjecture and imagination. The NLRB has decided a series of cases in which employers have attempted to retaliate against strikers by offering them jobs that were less than substantially equivalent to their former positions. *See, e.g., Harvey Eng'g & Mfg. Corp.*, 270 N.L.R.B. 1290, 1292 (1984) (employer violates section 8(a)(1) and (3) by removing returning striker from preferential hiring list due to striker's refusal of position that was not substantially equivalent to prestrike job); *MCC Pacific Valves*, 244 N.L.R.B. at 936 ("Respondent violated section 8(a)(1) and (3) of the Act when it terminated unreinstated strikers ... because [they] declined to accept reinstatement job offers which were not substantially equivalent to their [prestrike jobs.]"); *Providence Medical Center*, 243 N.L.R.B. 714, 743–44 (1979) (same); *Alcan Cable West*, 214 N.L.R.B. 236, 249–50 (1974) (same). In each of these cases, the Board exercised its "special function of applying the general provisions of the Act to the complexities of industrial life," *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 236, 83 S.Ct. 1139, 1150, 10 L.Ed.2d 308 (1963), and determined that returning strikers' reinstatement rights must include the right to be returned to their former or substantially equivalent positions. After observing employer retaliation in action, the Board reasonably concluded that the threat to the employees' right to strike was too great to permit an employer to demand that returning strikers accept particular jobs, un-

less the jobs are substantially equivalent to their prestrike positions.

I believe that the majority's reversal of the Board's rule is inconsistent with our limited review. Although a reviewing court might disagree with the Board's conclusion, " 'we are not free to substitute our judgment for that of the Board simply because we would have made a different decision....' " *NLRB v. Local 1131*, 777 F.2d 1131, 1136 (6th Cir.1985) (quoting *NLRB v. Pipefitters Union Local No. 120*, 719 F.2d 178, 181 (6th Cir.1983)). " 'The ultimate problem is the balancing of the conflicting legitimate interests. The function of striking that balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review.' " *Erie Resistor*, 373 U.S. at 236, 83 S.Ct. at 1150 (quoting *NLRB v. Truck Drivers Local Union No. 449*, 353 U.S. 87, 96, 77 S.Ct. 643, 648, 1 L.Ed.2d 676 (1957)). The only justification the majority offers for reaching a conclusion contrary to the Board's interpretation is its suggestion that allowing the returning strikers to refuse reinstatement to less than substantially equivalent employment will have some unarticulated, disastrous results, such as "upset[ting] the balance of interests sought to be served by court-created rules relating to reinstatement." Maj. Op. at 1501. I do not believe, however, that this analysis adequately supports a departure from the Board's reasonable application of the Act, which was developed in a series of cases in which the Board had a unique opportunity to balance the harm to employee rights with the employers' asserted justifications. Accordingly, I find that the ALJ, following Board precedent, properly held that all of the returning strikers retained the right to reinstatement to their former positions or substantially equivalent ones and, therefore, that the twelve abandoning strikers were not fully reinstated when they accepted interim positions at Lewisport. Consequently, as discussed above, the Company's preference of the twelve must be con-

sidered "discrimination" against the full-term strikers.

## II.

The question remaining is whether the Board reasonably concluded that this discrimination was "inherently destructive" of the full-term strikers' rights. As just discussed, permanently replaced returning strikers have the continuing right to be reinstated to their former positions or substantially equivalent ones, which includes the subsidiary right to be offered any positions for which they are qualified that open upon the departure of permanent replacements. *See Fleetwood Trailer*, 389 U.S. at 381, 88 S.Ct. at 547; *NLRB v. Mackay Radio & Tel. Co.*, 304 U.S. 333, 345–46, 58 S.Ct. 904, 910–11, 82 L.Ed. 1381 (1938); *Laidlaw*, 414 F.2d at 103–05; *MCC Pacific Valves*, 244 N.L.R.B. at 933–34, 936. When more than one returning striker is qualified to fill a job, however, the employer must determine a method of recall and may resort to "any one of a number of methods" to do so. *Mackay*, 304 U.S. at 347, 58 S.Ct. at 911; *see Lone Star Indus.*, 279 N.L.R.B. No. 78, 1985–86 NLRB Dec. (CCH) ¶ 17,980, at 30,889 (1986); *Bio-Science Laboratories*, 209 N.L.R.B. 796, 797 (1974).

Although the employer thus enjoys great freedom in devising a recall procedure, a plan will nonetheless violate section 8(a)(1) and (3) of the Act if it is adopted with the purpose of discriminating against those most active in the union. *See Mackay*, 304 U.S. at 347; 29 U.S.C. § 158(a)(1) & (3) (1982). In general, to find a violation of section 8(a)(1) and (3),[3] the Board must initially find "a discrimination and a resulting discouragement of union membership"

or other concerted activities protected under section 7 of the Act, 29 U.S.C. § 157 (1982).[4] *Great Dane*, 388 U.S. at 32, 87 S.Ct. at 796. If the employer is then able to satisfy its burden of showing "legitimate and substantial business justifications" for the challenged practice, *id.* at 34, 87 S.Ct. at 1798, a violation will be made out only if the Board finds that the employer was motivated by antiunion animus. *Id.* at 33–34, 87 S.Ct. at 1797; *see NLRB v. Brown*, 380 U.S. 278, 286, 85 S.Ct. 980, 985, 13 L.Ed.2d 839 (1965); *cf. Mackay*, 304 U.S. at 347, 58 S.Ct. at 911.

A finding of the employer's subjective antiunion motivation is unnecessary, however, if the Board can reasonably conclude that the employer's conduct is "inherently destructive" of employee rights protected by the Act. *See Great Dane*, 388 U.S. at 33–34, 87 S.Ct. at 1797; *Brown*, 380 U.S. at 287, 85 S.Ct. at 986; *Erie Resistor*, 373 U.S. at 227–29, 231, 83 S.Ct. at 1144–45, 1147. To come within the doctrine, an employer must distinguish between its employees on a basis that is in derogation of their rights to engage in concerted activities, and must confer benefits upon one class of employees, who are recognizable only by reference to the impermissible distinction, such that the effect on employee rights may not be termed "comparatively slight." *See Great Dane*, 388 U.S. at 32–34, 87 S.Ct. at 1796–97; *Erie Resistor*, 373 U.S. at 228–32, 83 S.Ct. at 1145–47. Only then may the employer's conduct be deemed so egregious that it bears its own indicia of antiunion motivation. *See Erie Resistor*, 373 U.S. at 231, 83 S.Ct. at 1147. Finally, if conduct may reasonably be labelled "inherently destructive," the Board may disregard the employer's asserted

---

**3.** Section 8 of the Act states in pertinent part:
(a) It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
. . . .
(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization. . . .

29 U.S.C. § 158(a)(1) & (3) (1982).

**4.** Section 7 of the Act states in pertinent part:
Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activites for the purpose of collective bargaining or other mutual aid or protection. . . .
29 U.S.C. § 157 (1982).

business justification and conclude that the inevitable harm to employee rights requires the finding that the Act has been violated. *See Great Dane,* 388 U.S. at 33–34, 87 S.Ct. at 1797; *Erie Resistor,* 373 U.S. at 228–29, 236–37, 83 S.Ct. at 1145, 1149–50.

Applying these principles, I believe that the Board reasonably concluded that the nature of the poststrike chronological recall plan was such that it revealed "its own indicia of intent," *Erie Resistor,* 373 U.S. at 231, 83 S.Ct. at 1147, and therefore deserved the "inherently destructive" label. As discussed above in Part I, the chronological plan was blatant discrimination against employees who exercised their statutory right to strike until the end. *Cf. Great Dane,* 388 U.S. at 32, 87 S.Ct. at 1797. The Board reasonably found that the Company distinguished between its employees on a basis that was inextricably intertwined with, and in derogation of, the full-term strikers' right to strike. The majority's contrary conclusion, that the plan "made no distinction between those who offered during the strike and those who did so after it ended," Maj. Op. at 1502, exalts form over substance. Since the final group to apply for reinstatement would inevitably be the full-term strikers, the Board was free to conclude that the plan preferred one group of employees over the other solely because they deserted the Union ranks.

Because the plan thus discriminated between employees based on their allegiance to the strike and the Union, it "surely may have [had] a discouraging effect on either present or future concerted activity." *Great Dane,* 388 U.S. at 32, 87 S.Ct. at 1797. Indeed, in this case the discouraging effects were more than hypothetical. Five of the twelve employees whose reinstatements are at issue here actually made their individual offers to return to work *after* the Union membership had voted to terminate the strike and the Union had communicated its offer to return to work on behalf of all of its members.[5] A more vivid example of the discouragement of union membership and concerted activities is difficult to imagine.

Furthermore, the Board reasonably concluded that benefits granted to those employees who abandoned the strike were so valuable that the resulting harm to employee rights could not be considered "comparatively slight." *Great Dane,* 388 U.S. at 34, 87 S.Ct. at 1798. The place that permanently replaced economic strikers occupy on a reinstatement list is of the utmost concern to the strikers. A grant of preferential reinstatement rights means that the benefitted employees will be returned to work at an earlier date, begin receiving paychecks again, and accrue greater seniority rights. To condition such a valuable preference solely on the employees' decision to desert the Union is conduct that can only serve to induce such desertion, as the behavior of the five who made their offers after the Union's suggests, and is thus in conflict with the Act's goal of protecting concerted activity.

Under these circumstances, the Board's determination—that use of the chronological recall list after termination of the strike was "inherently destructive" of the rights of full-term strikers—was supported by substantial evidence, 29 U.S.C. § 160(e) (1982). *See George Banta Co. v. NLRB,* 686 F.2d 10, 18–19 (D.C.Cir.1982) (enforcing NLRB decision which found similar reinstatement plan "inherently destructive"). The Company's blatantly discriminatory conduct, and the profound effects that it would inevitably have, justified the Board's conclusion that poststrike utilization of the chronological list violated the Act, without regard to the Company's subjective intent.[6]

---

**5.** The ALJ explicitly found that the five employees made their individual offers to return after the Union's. Since the Union's offer was made at approximately 1 a.m., and the five employees made their offers between approximately 8 and 9:30 a.m. the same morning, I must conclude that the ALJ's finding is supported by substantial evidence. *See* 29 U.S.C. § 160(e) (1982).

**6.** I would also affirm the Board's conclusion that the Company's "inherently destructive" conduct was not privileged by the Company's asserted business justifications. *See NLRB v. Great Dane Trailers, Inc.,* 388 U.S. 26, 34, 87 S.Ct. 1792, 1798, 18 L.Ed.2d 1027 (1967); *NLRB v. Erie Resistor Corp.,* 373 U.S. 221, 228–29, 236–37, 83 S.Ct. 1139, 1145, 1149–50, 10 L.Ed.2d 308 (1963).

Moreover, in my opinion the majority unjustifiably criticizes this conclusion by suggesting that it makes unlawful after the strike a practice that was lawful during the strike. Contrary to the majority's statement that "the procedure was admittedly lawful during the strike," Maj. Op. 1501, the Union and General Counsel have conceded only that the actual recalls from the chronological list during the strike were lawful, a point which has never been in dispute. The Union and General Counsel have not conceded, however, the legality of the Company's oral promises to abandoning strikers that they would be granted post-strike preferential reinstatement to Cloverport. Indeed, the finding that the post-strike preferential reinstatements were *inherently* destructive necessarily implies that the original promises were also violative of the Act.[7]

Finally, I must also reject the majority's contention that the reinstatement plan was lawful because it was "applied consistently." Consistent application will not save a plan that is inherently destructive of employees' rights to engage in concerted activities.

For the foregoing reasons, I would enforce the Board's Decision and Order.[8]

7. The Company argues that this action was barred by the six-month statute of limitations, 29 U.S.C. § 160(b), because the promises occurred outside the limitations period, and the actual transfers were merely in execution of those promises. To succeed in this defense, the Company had the burden of proving that the Union had clear and unequivocal notice, either actual or constructive, of the Company's promises to the twelve, and that such notice occurred outside the limitations period. *See Strick Corp.,* 241 N.L.R.B. 210 n. 1 (1979); *see also Adkins v. International Union of Elec., Radio & Mach. Workers,* 769 F.2d 330, 335 (6th Cir.1985). The Board held, however, that the Company failed in its burden of proof, and I conclude that this holding is supported by substantial evidence. *See* 29 U.S.C. § 160(e) (1982). Although the Union was undoubtedly aware that some preference plan was instituted, the Company's proof failed to show clear and unequivocal notice, either actual or constructive, of its intention to preferentially transfer abandoning strikers to Cloverport. Only after the Board handed down its decision did the Company move to reopen the record to introduce affidavit testimony of strikers that would tend to prove such notice, but the Board properly concluded that the affidavit testimony was not newly discovered or previously unavailable evidence that would war-

rant reopening the record. Under these circumstances, the Board correctly held that the Union was not put on notice of the impending transfers until the first transfer occurred, which was indisputably within the limitations period.

8. I reject the Company's argument that the Board's decision mandates that the Company recall its strikers according to seniority. The Act, of course, imposes no such requirement absent a binding agreement or past practice. *Lone Star Indus.,* 279 N.L.R.B. No. 78, 1985–86 NLRB Dec. (CCH) ¶ 17,980, at 30,889 (1986). In the instant case, however, the Board specifically determined that immediately after the strike the *Company chose* to reinstate full-term strikers according to their pre-strike seniority. Having properly determined that the preference granted to the abandoning strikers was in violation of the Act, the Board merely ordered the Company to treat the twelve on the same basis as it treated the full-term strikers. Thus, because the Company chose to reinstate full-term strikers according to seniority, the remedy adopted the same criterion. The Board did not require the original seniority-based recall list, nor does its present order impose a future requirement of such recalls. The Board's decision, therefore, imposes no affirmative duty on the Company that is inconsistent with the Act.